**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| **IN RE: ARCHERY PRODUCTS ANTITRUST LITIGATION**<br><br>*This document relates to:*<br><br>INDIRECT PURCHASERS | MDL No. 3160<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS


Introduction ........ 3

Parties ........ 3

Jurisdiction and Venue ........ 9

Facts ........ 10

- I. The Archery Products market is large and growing. ........ 11
- II. The Archery Trade Association facilitated the alleged conspiracy ........ 13
- III. Defendants conspired to inflate Archery Product prices. ........ 20
- IV. Defendants succeeded in their anticompetitive conspiracy. ........ 40

Relevant Market ........ 43

Statute of Limitations and Tolling ........ 46

Class Allegations ........ 47

Antitrust Injury ........ 50

Causes of Action ........ 51

- I. Violation of the Sherman and Clayton Acts ........ 51
- II. Violations of State Antitrust Laws ........ 53
- III. Violations of Consumer Protection and Deceptive Trade Practices Statutes ........ 59

Demand for Jury Trial ........ 62

Prayer for Relief ........ 62

Plaintiffs Brock Montpetit and David Tapia, on behalf of themselves and all others similarly situated (collectively "Plaintiffs"), bring this action to obtain injunctive relief and to recover overcharge damages on Archery Products (defined below) resulting from anticompetitive agreements between Defendants to raise and maintain prices artificially. Plaintiffs make the following allegations:

## INTRODUCTION

1. The global Archery Products market size was approximately $2.42 billion in 2023 and is expected to continue to grow rapidly as archery gains popularity as both a recreational activity and a competitive sport.

2. Advances in equipment technology have made archery more accessible and more appealing to a broader audience, adding to the growth in the market.

3. As the market for Archery Products grows, manufacturers and certain retail outlets have, with the orchestration of the Archery Trade Association ("ATA"), colluded to implement and enforce Minimum Advertised Pricing Policies ("MAPs") to create and maintain a supra-competitive price floor for all of their equipment and reduce competition within the retail sector of the market.

## PARTIES

4. Plaintiff Brock Montpetit is a citizen of Wisconsin who purchased one or more pieces of Archery Products that was manufactured by one or more of the Defendants. The Archery Products Plaintiff purchased was sold at artificially inflated prices due to Defendants' conduct as alleged herein. Specifically, Plaintiff purchased a bow and related components within the last two years and has purchased arrows and

accessories within the last year from local Archery stores in both Wisconsin and Minnesota. Plaintiff Montpetit has been a bowhunter for many years and enjoys this hobby. Thus, he has an ongoing need and plan to purchase Archery Products.

5. Plaintiff David Tapia is a citizen of Texas who purchased one or more pieces of Archery Products that was manufactured by one or more of the Defendants and sold to Plaintiff at artificially inflated prices due to Defendants' conduct as alleged herein. Specifically, Plaintiff purchased a crossbow, as well as arrows and other archery components within the Class Period, as defined herein, from Amazon.com. Plaintiff Tapia has been a bowhunter for many years and enjoys this hobby. Thus, he has an ongoing need and plan to purchase Archery Products.

6. Defendant Hoyt Archery, Inc. ("Hoyt") is a Utah corporation with its primary place of business at 593 North Wright Brothers Drive, Salt Lake City, Utah. At all relevant times, Hoyt was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

7. Defendant Bowtech, Inc. ("Bowtech") is a Delaware corporation with its primary place of business at 90554 Highway 99 N, Eugene, Oregon. At all relevant times, Bowtech was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP policy under the "Bowtech," "Excalibur Crossbow," "Diamond Archery," "Stryker Crossbows," and "Octane Accessories" trade names; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States alleged herein.

8. Defendant Mathews Archery, Inc. ("Mathews") is a Wisconsin corporation with its primary place of business at 919 River Road, Sparta, Wisconsin. At all relevant times, Mathews was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP policy; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

9. Defendant Precision Shooting Equipment, Inc. ("PSE") is a Delaware corporation with its primary place of business at 2727 North Fairview Avenue, Tucson, Arizona. At all relevant times, PSE was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States. PSE is owned by Heritage Outdoor Group LLC.

10. Defendant Bear Archery, Inc. ("Bear") is a Florida corporation with its primary pace of business at 817 Maxwell Avenue, Evansville, Indiana. At all relevant times, Bear was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

11. Defendant Hunter's Manufacturing Company, Inc. d/b/a TenPoint Crossbow Technologies ("TenPoint"), is an Ohio corporation with its primary place of business at 1325 Waterloo Road, Mogadore, Ohio. At all relevant times, TenPoint was a member of the ATA; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

12. Defendant Tomorrow's Resources Unlimited, Inc. d/b/a T.R.U. Ball / AXCEL Archery ("T.R.U. Ball Archery") is a Virginia corporation with its primary place of business at 130 Integrity Lane, Madison Heights, Virginia. At all relevant times, T.R.U. Ball Archery was a member of the ATA; sold archery products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

13. Defendant Easton Technical Products, Inc. d/b/a Easton Archery ("Easton") is a Utah corporation with its primary place of business at 5040 W Harold Gatty Drive, Salt Lake City, Utah. At all relevant times, Easton was a member of the ATA; sold archery products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

14. Defendant Cabela's LLC ("Cabela's") is a Delaware limited liability company with its primary place of business at 1 Cabela Drive, Sidney, Nebraska. Cabela's has 171 retail locations throughout the United States, as well as an internet storefront. Until 2017, Cabela's was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP policy; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States. In 2017, Cabela's was acquired by Bass Pro Shops.

15. Defendant DICK'S Sporting Goods, Inc. ("Dick's") is a Delaware corporation with its primary place of business at 345 Court Street, Coraopolis, Pennsylvania. It has stores located throughout the United States, as well as an internet storefront. At all relevant times, Dick's was a member of the ATA; sold Archery Products subject to a MAP

policy; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

16. Defendant BPS Direct, LLC, d/b/a Bass Pro Shops ("Bass Pro Shops") is a Delaware corporation with its primary place of business at 2500 E Kearney Street, Springfield, Missouri. Bass Pro Shops has approximately 200 retail locations throughout the United States, as well as an internet storefront. At all relevant times, Bass Pro Shops was a member of the ATA; sold Archery Products subject to a MAP policy; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

17. Defendant Jay's Sports, Inc. d/b/a Jay's Sporting Goods ("Jay's Sporting Goods") is a Michigan corporation with its primary place of business at 8800 S Clare Avenue, Clare, Michigan. Jay's Sporting Goods has two retail locations in Michigan and an internet storefront. At all relevant times, Jay's Sporting Goods was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP policy; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

18. Defendant Kinsey's Outdoors, Inc. ("Kinsey's") is a Pennsylvania corporation with its primary place of business at 1660 Steelway Drive, Mount Joy, Pennsylvania. Kinsey's distributes outdoor goods, including Archery Products, to more than 4,600 retailers across the United States, in addition to its own retail location and internet storefront. At all relevant times, Kinsey's was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP policy;

and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

19. Defendant Lancaster Archery Supply, Inc. ("Lancaster") is a Pennsylvania corporation with its primary place of business at 2195A Old Philadelphia Pike, Lancaster, Pennsylvania. Lancaster describes itself as "a leading worldwide archery distributor" with its own retail location and internet storefront. At all relevant times, Lancaster was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP policy; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

20. Defendant Scheels All Sports, Inc. d/b/a Scheels ("Scheels") is a North Dakota corporation with its primary place of business at 1707 Gold Drive S, Fargo, North Dakota. Scheels has thirty-four retail locations across sixteen states and an internet storefront. At all relevant times, Scheels was a member of the ATA; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

21. Defendant Archery Trade Association is a Virginia corporation with its primary place of business at 117 South Valley, New Ulm, Minnesota. The ATA is the trade association that represents the economic interests of corporations involved in the manufacture, wholesale, retail, sales, and distribution of Archery Products. According to the ATA, one of its primary purposes is to "maintain and enhance the profitability and economic viability of individuals, companies and corporations in the archery industry." At all relevant times, the ATA developed and promoted MAPs throughout the archery

industry; and arranged and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

22. Defendant TrackStreet, Inc. ("TrackStreet"), is a Delaware corporation with its primary place of business at 9811 W Charleston Blvd, Suite 2-776, Las Vegas, Nevada. At all relevant times, TrackStreet offered to provide Defendants with software to create, track, and enforce their MAPs. In particular, TrackStreet provides brands with digital tools to track and enforce pricing policies such as MAPs. Features include on-demand notifications of MAP policy violations and customizable messages to send to violators. Additionally, TrackStreet helps clients to formulate pricing policies, including MAPs.

23. Defendant NeuIntel, LLC, d/b/a PriceSpider, f/k/a Oris Intelligence ("Oris"), is a California corporation with its primary place of business at 20 Pacifica, Suite 1000, Irvine, California. At all relevant times, Oris offered to provide Defendants with software to create, track, and enforce their MAPs. Oris touts its MAP monitoring solution, Prowl, as "the world's most advanced MAP monitoring software." Oris also advises on the content of MAPs and provides MAP policy violation letter templates.

**JURISDICTION AND VENUE**

24. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than 100 members of the class; and at least one member of the class is a citizen of a state different from that of one of the Defendants.

25. This Court has personal jurisdiction over each of the Defendants under 15 U.S.C. § 22 because each Defendant: (a) transacted business in the United States, including in this District; (b) manufactured, sold, shipped, or delivered substantial amounts of product in the United States, including in this District; (c) has substantial contacts with the United States, including this District; and/or (d) engaged in anticompetitive conduct that had the direct, foreseeable, and intended effect of injuring the business or property of persons residing in, located in, or doing business in the United States, including in this District. Moreover, each of the Defendants, individually and collectively, purposefully directed their business activities toward, and had substantial contacts with, this jurisdiction.

26. Defendants, directly or through their agents, subsidiaries, affiliates, or parents, may be found in and transact business in the forum state.

27. Defendants, directly or through their agents, engage in interstate commerce in the production, distribution and/or sale of Archery Products, or in business related thereto.

28. Defendants, directly or through their agents, engaged in unlawful acts alleged herein within this District and that had effects within this District.

29. Venue is proper in this Court under 28 U.S.C. § 1391, because, during the relevant Class Period, at least one of the Defendants resided in and transacted business in this District and because the trade and commerce described herein was and is carried out, in substantial part, in this District.

## **FACTS**

## I. The Archery Products market is large and growing.

30. In this case, "Archery Products" refers to products used by consumers for bowhunting or archery. For purposes of this action, Archery Products consist of five main product markets, submarkets, or cluster markets: (i) bows—including compound bows, recurve bows, longbows, and crossbows—and their components; (ii) arrows (minus the arrowhead) and their components, including the shaft, fletching, and nock; (iii) arrowheads (or arrowpoints) including broadheads and field points; (iv) targets, including bag targets, foam targets, and 3D targets; and (v) accessories, such as bow cases, arrow quivers, sights, scopes, and stabilizers.

31. A national participation survey commissioned by the ATA revealed that, in the United States, 9.9 million people identify as bowhunters, 17.6 million people indicate they are recreational archers, and 5.4 million individuals are competitive archers. Each of these activities requires the purchase of Archery Products.

32. In 2024, the global Archery Products market was estimated at approximately $4.16 billion with the United States comprising about 89% of the market. The Archery Products market is predicted to reach $4.62 billion in 2025 and $5.99 billion in 2030.

33. Archery Products are sold to consumers by retailers. The retailers obtain their Archery Products either directly from manufacturers or through distributors. The retailers fall into two main categories: (i) specialty sports stores—those stores catering specifically to the archery or hunting market; and (ii) big box sporting goods stores—those

stores offering equipment for a broad range of sporting activities. The big box sporting goods stores have a large online presence as well.

34. In general, multi-channel retailers, including the big box sporting goods stores, source their Archery Products directly from manufacturers, as do locally owned specialty retailers (roughly 20% of shops). Smaller archery shops (roughly 80% of shops) generally source their Archery Products through distributors.

35. There are approximately 6000 retail outlets in the United States that sell Archery Products; of those about 1500 are full-time archery-only retailers. The remaining 4500 stores are a mix of sporting goods stores, online retailers, and other businesses that sell some Archery Products alongside other products.

36. Archery Products are expensive. According to a 2023 ATA report, only 7% of bows cost under $300, while 28% cost between $300 and $600, 16% cost between $600 and $900, 23% cost between $900 and $1200, and 19% cost more than $1200. Similarly, arrows can cost more than $100 for six-packs; arrowheads can cost around $40 for three-packs; and targets range in cost from $50 to hundreds of dollars. Profit margins for bows tend to be around 27% while profit margins for accessories are closer to 40%.

37. For purposes of the antitrust dimension of this class action, the relevant product market is the Archery Products market, and the relevant geographic market is the United States.

38. Defendants conspired to raise prices on Archery Products by adopting, implementing, and enforcing MAPs that impact millions of consumers across the United States. In furtherance of their conspiracy, Defendants also repeatedly and continuously

exchanged confidential and competitively sensitive information among themselves, despite being direct competitors in this market.

39. At all relevant times, Defendants possessed market power at the manufacturing, distribution, and retail levels in the Archery Products supply chain in the United States and its territories. Market power at each level of the supply chain made possible a scheme to significantly raise prices above competitive levels without the risk of losing a proportional number of sales. With substantial market power at each level, consumers could not shift to other companies or products to defeat artificial price increases.

**II. The Archery Trade Association facilitated the alleged conspiracy.**

40. The ATA is an industry trade association focused on the sports of archery and bowhunting. It allows for a few different membership types: “Retailers and Ranges;” “Manufacturers & Distributors;” and “Additional Membership Types.” None of the membership types allow consumers to join. And the ATA does not list its members publicly.

41. Between 2002 and 2023, ATA membership has risen from 505 to over 2500. Significant incentives to join the ATA include access to member-only benefits like attending the ATA Trade Show, use of the ATA Connect online forum, and a Member Directory.

42. The ATA reports that 80% of its members belong to businesses along the Archery Products supply chain, including manufacturers, distributors, and retailers. Thus, many of the ATA members are horizontal competitors in the Archery Products market.

43. Through ATA events, the members have ample opportunity to meet and discuss their shared financial interests. For example, the ATA's Board of Directors, its Retail Council, its annual Trade Show, and "ATA Connect" all provide regular opportunities to meet and discuss the implementation and enforcement of industry-wide MAPs on Archery Products.

44. The ATA's Board of Directors consists of individuals involved in manufacturing, distributing, and retailing Archery Products. At all times relevant to this action, there have been horizontal competitors on the ATA Board of Directors from each level of the Archery Products market.

45. The ATA's Board of Directors "guides ATA actions and shapes the organization's policies and positions." At the direction and with the knowledge of its Board of Directors, the ATA has promulgated rules, guidelines, practices, and procedures that have substantially restrained retail price competition for Archery Products sold in the United States.

46. ATA directors have openly supported strict MAP enforcement, with one former director boasting about how seriously they take enforcing their MAP guidelines and crediting that enforcement for his company's "really high" sales last year.

47. The ATA Board of Directors, by fiscal year, is shown in the chart below:

| **ATA Board of Directors, by year** | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Organization** | Representative(s) | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| **Number of Board Members:** | | **18** | **17** | **20** | **20** | **20** | **20** | **20** | **20** | **20** | **20** | **20** |
| **3Rivers** | Teresa Williams | | | X | X | X | X | X | X | X | X | X |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ArchersUSA** | Timmy Thomas | | | | | | | X | X | | | |
| **Archery Headquarters** | Randy Phillips | X | X | X | X | X | X | X | X | X | X | X |
| **Archery Only** | Wayne Piersol | | | X | X | X | X | X | X | X | X | X |
| **ARRO** | Deb Colgrove; Will Moulton | | | X | X | X | X | X | X | X | X | X |
| **ATA** | Matthew Kormann; Jay McAninch; Jeff Poole; Becky Lux | X | | X | X | X | X | X | X | X | | |
| **Bass Pro Shops** | Dean Snelson; Sean Streff; Darren Hogan | X | X | X | X | X | X | X | X | X | X | X |
| **Bear** | Jack Bowman; Jonathan Lene; Ryan Shutts | | X | X | | | X | X | X | X | X | X |
| **Black Eagle** | Randy Kitts | | | | | X | X | X | X | | | |
| **Bohning** | Scott Billsby | X | X | | | | | | | | | |
| **BowTech** | David Fee; Scott Henrickson | X | | | X | X | | | | | | |
| **Cabela's** | Tom Gallagher | X | X | | | | | | | | | |
| **Cimmarron** | Peter Gussie | X | X | | | | | | | | | |
| **Easton** | Aaron Lucky | | | | | | | | | X | X | X |
| **Gateway** | Todd Vaaler | | X | X | X | | | | | | | |
| **Genesis** | Todd Bahnub | | | X | | | | | | | | |
| **Headhunter** | Jeff Adee | X | X | X | | | X | X | X | X | | |
| **Hoyt** | Tom Driffil; Randy Walk | | | | X | X | X | X | X | | | |
| **Jay's Sporting Goods** | Mark Copeland | X | X | X | X | X | X | X | X | X | | |
| **JDE** | Greg Easton | X | X | X | | | | | | | | |
| **Kinsey's** | Justin Gorman; Dave Parker | | X | X | X | X | X | X | X | X | X | X |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Lancaster** | Rob Kaufhold | X | X | X | X | X | X | | | | | |
| **Mathews** | Jerrod Hoff; Joel Maxfield | | | | X | X | X | X | X | X | X | X |
| **Morrell** | Dale Morrell | | | | | | | | | X | X | X |
| **Music City** | Jeff Greer | | | | | | | | | | X | X |
| **MWS** | Kurt Bassuener | X | X | | | | | | | | | |
| **NABA** | Gary Kinard | | | X | X | X | X | X | X | X | X | X |
| **OutTech** | Jay Scholes; John Seliga | | | X | X | X | X | X | X | X | X | X |
| **Plano** | BJ Wolf | X | | | | | | | | | | |
| **PSE** | David Kronengold; Blake Shelby | X | X | X | X | X | X | | | | | |
| **Primos/Vista Outdoor Inc.** | Jimmy Primos; Jason Harris | X | X | X | X | X | | | | | X | X |
| **Pure Archery** | Dave Fleming; Jon Dumars; Mitch Mitchell; Jef Suiter | | | X | | | | | | X | X | X |
| **Rinehart** | James McGovern | | | | X | X | X | X | X | X | X | X |
| **Robinson** | Scott Shultz | X | X | | | | | | | | | |
| **Scheel's** | Rod Hartl | | | | X | X | X | X | X | X | X | X |
| **SYKD** | Matthew Smith | | | | | | | | | X | X | X |
| **TenPoint** | Keith Arnold | | | | | | | X | X | X | X | X |
| **T.R.U. Ball** | Benjamin Summers | X | X | X | X | X | X | X | X | | | |
| **Wildlife Research Ctr.** | Steve Lambeth | | | | | | | | | | X | X |

48. Similar to the Board of Directors, the ATA formed a Retail Council, led by several individual Board members. The Retail Council was re-established in 2016 for the purpose of improving "the industry's archery and bowhunting markets."

49. The Retail Council meets regularly "to discuss pressing issues" and "all industry happenings." One of the regular topics at the Retail Council meetings is the MAPs and the enforcement of them—with one of the ATA's directors going so far as to note that the MAPs are "probably one of the most talked about topics in the archery industry."

50. Members of the Retail Council have supported MAPs. In fact, one member explained that "manufacturers should create MAP policies, and retailers should honor them" because "every business in the industry must work together as a group to be productive and profitable, which includes strong MAP policies and procedures." With another Retail Council member warning that "disobeying MAP policies . . . can have big consequences."

51. Members of the ATA's Retail Council, by year, are shown in the chart below:

| ATA Retail Council, by year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Organization** | Individual(s) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| **Number of Council** | | **12** | **12** | **15** | **15** | **15** | **14** | **14** | **14** |
| **All Star Archery** | Gary Kinard | X | X | X | X | X | X | X | X |
| **Archery Headquarters** | Randy Phillips; Marty Stubstad | X | X | X | X | X | X | X | X |
| **Archery Only** | Wayne Piersol | X | X | X | X | X | X | X | X |
| **ARRO** | Deb Colgrove | X | X | X | X | X | X | X | X |
| **ATA** | Kurt Smith; Nicole Nash | X | X | X | X | X | X | X | X |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Average Joe's** | Joe Caminati | | | | | | | X | X |
| **Bass Pro Shops** | Darren Hogan | X | X | X | X | X | X | X | X |
| **Butch's Sports World** | G.C. "Butch" Herold | | | X | X | | | | |
| **Central Cascades Archery** | Al Barton | | | | | | | X | X |
| **Cimmarron** | Peter Gussie | X | X | X | X | | | | |
| **Dead-On Archery** | TJ Hofhines | X | X | X | X | X | | | |
| **Jay's Sporting Goods** | Mark Copeland | X | X | X | X | X | X | | |
| **La Crosse Archery** | Laura Rosenthal | X | X | X | X | X | X | | |
| **Korbin's Archery** | Korbin Williams | | | | | X | X | X | X |
| **Lancaster** | Chris Scott | | | | | X | X | X | X |
| **M&M Archery Range** | Krysta Wright | | | X | X | X | X | X | X |
| **Music City Archery** | Jeff Greer | | | X | X | X | X | X | X |
| **Scheel's** | Rod Hartl | X | X | X | X | X | X | X | X |
| **Weaver's Archery** | Keith Weaver | | | X | X | X | X | | |
| **Wyvern Creations** | David Wilkins | X | X | | | | | | |
| **X10 Archery** | Lynda Whitehead | | | | | | | X | X |

52. Another opportunity for the competitors to meet and collude on the MAPs is at the annual trade shows that the ATA sponsors. ATA trade shows are well attended by industry participants. For example, every major bow manufacturer attended the 2016 ATA trade show, as did 1168 retail and distribution buying companies.

53. MAPs are openly discussed at ATA Trade Shows. At one ATA Trade Show, a leading archery company posted placards around its booth reminding retailers "that it aggressively enforces its MAP policies." And, at the 2015 ATA Trade Show, "[a]bout 60 representatives of ATA-member manufacturers, distributors and retailers attended [a] meeting to review a sample MAP/MPR policy[.]"

54. In addition to opportunities to meet and discuss pricing and MAP

enforcement at Board meetings and trade shows, the ATA created a web-forum for its members called ATA Connect. The ATA describes this platform as a place that "helps you build peer connections and talk regularly with like-minded business owners." All ATA members were able to use the forum to "share ideas, ask questions, and get business advice." ATA Connect had two forum sharing options—one that was available to all members and one that was exclusive to ATA-member retailers.

55. According to the ATA, the Retail Growth Interact community, an ATA Connect subforum, allowed ATA retail members "[t]o communicate with other retailers and learn how they stay ahead of the learning curve," as "a confidential space for retailers to network and find solutions to business challenges through constructive discussions." In particular, the ATA has explained to retail members: "Retail Growth Interact is a great place to share ideas and ask questions about the topics that matter most to your business, including buying patter[n]s, profit margins and what to charge for services." In addition, on ATA Connect, members could access various resources, such as member and company directories.

56. ATA Connect facilitated ongoing discussions surrounding MAPs—with posts urging members to "discuss MAP with your peers."




57. ATA Connect also pushed members to "find solutions that boost business and benefit the industry by tackling topics like MAP policies[.]" Further, the ATA has specifically sent its retail members to the Retail Growth Interact Community on ATA Connect to discuss "topics like MAP policies" within "a safe online space."

58. All of these practices are patently anticompetitive.

**III. Defendants conspired to inflate Archery Product prices.**

59. Defendants agreed, combined, or conspired to artificially raise, fix, maintain, or stabilize prices of Archery Products in the United States and its territories. To implement this unlawful scheme, the manufacturer and retailer Defendants—acting through and with the aid of ATA—conspired and agreed to implement and enforce MAPs for Archery Products. The intent and result of this conspiracy was inflated prices for Archery Products throughout the Class Period (defined below).

60. This conspiracy was borne from rising concern within the industry about increasing price competition and diminishing profit margins in the market for Archery Products. To address this concern, Defendants, via the connections fostered, facilitated, or made available by the ATA, ultimately agreed upon a common course of action to reduce

or eliminate retail price competition and extract monopolistic rents from the Archery Products market—the adoption, implementation, and strict enforcement of MAPs.

61. The ATA heard these concerns within the industry and responded by taking an active role in facilitating the conspiracy. The ATA organized meetings and platforms for its members to discuss and develop strategies to combat price competition—ultimately agreeing on MAP implementation and enforcement.

62. The goal of Defendants' strategy was to artificially raise retail prices on all Archery Products throughout the country. They succeeded in that goal, and Plaintiffs and the proposed Class paid supra-competitive prices as a result.

63. Beginning by at least 2014, Defendants agreed, combined, or conspired to artificially inflate, fix, maintain, or otherwise stabilize Archery Products prices in the United States. To implement their unlawful contract, combination, or conspiracy, the manufacturer and retailer Defendants—acting through, in concert with, or with the aid of the ATA and other co-conspirators—agreed to implement and strictly enforce sale price floors for Archery Products, under the guise of MAPs. As a direct and proximate result of Defendants' intentional conduct, Archery Products prices were artificially inflated to supra-competitive levels and Plaintiffs were thereby injured.

64. Bass Pro Shops and Cabela's joined the ATA board in 2014. It was with their support that industry participants adopted and enforced MAPs.

65. The ATA's position on MAPs was memorialized in a December 31, 2014, blog post by ATA CEO Jay McAninch, titled "MAP: United We Stand, Divided We Fall." The blog highlighted that industry-wide adoption and enforcement were necessary for

profitability, and McAninch urged other manufacturers and retailers to join forces and agree to the policies:

> Unfortunately, this unprecedented interest has increased competition so much that some companies ignore MAP (minimum advertised price) just to make a sale . . . .
>
> MAP has been controversial largely because it's associated with price fixing, which means setting a minimum or maximum price for selling consumer goods. It's a complicated law, and recent Supreme Court decisions are causing ripples throughout lower courts and consumer-advocacy groups . . . .
>
> I believe to deal with this MAP issue, our industry must hold an open, honest dialogue about it. Everyone must participate because if we don't address the damage to our business model, we risk losing in the long term the sustained growth we've enjoyed. Since this involves everyone the ATA is the right group to facilitate this discussion and provide the vehicle for the industry to unite behind constructive, positive changes.
>
> To ensure the industry addresses these issues, we've engaged the ATA Board of Directors, and the leader of [buying groups] ARRO [Archery Rancher and Retail Organization], NABA [National Archery Buyers Association], NBS [Nation's Best Sports] and Sports Inc. We've also included manufacturers and distributors who expressed interest in MAP. In the months ahead, we'll facilitate a dialogue that examines what our industry's business leaders think can and should be done about MAP. To that end, the ATA will offer our MAP policy as a template that companies can use as a tool if they take action.
>
> We can't solve industry problems until we involve everyone in a conversation that shares concerns and develops a course of action. This first step basically "turns on the lights" because it requires everyone to share what they think about this issue's impacts on our industry. Once we have a clear sense of what MAP is about for ATA members, we can start a process that deals with it.

66. The ATA's template MAP was designed for the purpose of "protect[ing] our companies from state and federal legal actions, while clearly informing other companies of their unilateral policy on product pricing." ATA also created a checklist of key considerations "for forming—and enforcing—a sound effective MAP policy."

67. The ATA held a seminar at its trade show about creating and enforcing MAPs and went on to issue a newsletter following the seminar about MAPs advising members who "want[ed] to control the minimum advertised price (MAP) and/or the minimum resale price (MRP) of their products," that they "must create [a] policy statement, issue it to all resellers, and then enforce it consistently and forcefully with no negotiation."

68. The ATA further intensified its efforts of coordinating industry-wide MAPs, including through social media posts. For example, in February 2015, the ATA posted the following to Twitter (now X):




The since-deleted article to which this post linked bore a straightforward title: "ATA Helps Members Develop MAP Policies".

69. Perhaps recognizing the legal implications of what they are promoting, the ATA's newsletter in 2015 explained that "[t]he ATA cannot set or enforce MAP/MRP

policies for the industry because it would violate antitrust laws. However, the ATA can provide help and information so individual manufacturers can craft their own policies, which the companies must then enforce themselves."

70. This newsletter also expanded on the sample MAP policy that the ATA offered in 2014 and then included a "three-step plan . . . to help ATA-member manufacturers and distributors adapt a sample policy for their own use."

71. Further, the ATA went on to publish a MAP resource library for its members, which provided template policies and additional resources for retailers and manufacturers.

72. The ATA's push for industry-wide adoption and enforcement worked. For example, Defendant Kinsey's announced an updated MAP in June 2015. In a corresponding press release, Defendant Kinsey's explained:

> MAP policies exist to benefit both retailers and manufacturers by elevating the perception of brand value, which leads to increased margins for retailers. Kinsey's stands behind manufacturers in their implementation of minimum advertised pricing to protect the interests of their brands, as well as margin integrity within the retail network.

73. But implementation of a MAP was not enough. Strict enforcement was necessary for the price floors to be effective because many product resellers purchase Archery Products from distributors or retailers (including the retailer Defendants) as opposed to directly from the manufacturers. Kinsey's June 2015 press release further explained that, as part of its MAP updates, it would be policing the MAPs of Archery Products manufacturers, such as TenPoint Crossbow Technologies. Indeed, TenPoint Vice President explained that "Kinsey's has done a great job of backing TenPoint's

enforcement of its MAP policy, thus strengthening the TenPoint brand as well as helping the retailers maintain a solid profit margin. This MAP enforcement is important in order to keep the retailer base, and archery as a whole, healthy."

74. T.R.U. Ball Archery's ("TRU") MAP policy is the epitome of policing throughout the supply chain. TRU's MAP policy includes the following penalties for violations:

> New MAP Violator:
>
> A warning will be issued. Violator will be evaluated in approximately two weeks to determine if they have raised prices to MAP levels.
>
> Repeat MAP Violator:
>
> First repeat infraction—Violators who have been notified that they are below MAP pricing within the last six months will be given a 48-hour warning to raise prices to MAP levels. Violators who have not raised prices to MAP levels after this time period will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 30 days.
>
> Second Repeat Infraction—Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for a second time will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 60 days.
>
> Three or More Repeat Infractions—Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for more than two times will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for the greater of 60 days or until prices have been raised to MAP levels for at least 30 days.

75. Distributors who sold TRU Archery Products to other resellers (*e.g.*, Cabela's supplying a small shop) were subject to additional conditions and penalties:

> Distributor Violators:

T.R.U., Inc. will be using contracts from around the United States to purchase products from sources who are known to be violating MAP levels.

First Infraction
Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 30 days.

Second Infraction
Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 60 days.

Third Infraction
Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List indefinitely.

76. In a June 23, 2015, post on the industry forum *Archery Talk,* one retailer remarked, "My hope is that the ATA association [*sic*] is successful in establishing an industry wide rule set that will be enforced industry wide."

77. MAPs and enforcement continued to gain acceptance throughout the industry for the next several years as they were discussed publicly and privately at the ATA.

78. In a 2016 article titled, "ATA Members Weigh in on MAP," the ATA reflected on its success in implementing MAPs and highlighted its efforts thus far, stating, "More than one year later, there's still good news and bad. However, the ATA and its member companies have worked tirelessly to discuss, craft[,] and enforce MAP policies that could help manufacturers, retailers[,] and the industry."

79. This article included statements from several Archery Products suppliers. For example, Mike Ellig, the founder of Archery Products manufacturer Black Gold Inc.,

cited the pivotal role that the ATA's model MAPs and advocacy efforts had in inflating his company's margins:

> I was ready to charge ahead, but as a small-business owner, I didn't know where to start and I didn't have two months to create a policy from scratch. Jay [McAninch] connected me with the ATA's lawyers and provided resources I wouldn't have found otherwise out here in Bozeman, Montana.

80. Black Gold's MAP policy has been in place about two years. Ellig said he notices more companies adhering to the MAP policy and also has "cut off"—*i.e.*, reduced or discontinued sales to—downstream market participants who failed to abide by it.

81. Ellig went on to explain that the implementation and enforcement of MAPs would benefit Archery Products suppliers as a whole via higher margins. Ellig therefore encouraged other market participants to embrace MAPs even if they mean sacrificing profits in the short term. As quoted in the article, Ellig said:

> Enforcing MAP policies is up to every individual company. . . . It's a lot of extra effort. A lot of people will decide it's not worth the hassle because it's so much work. Some won't take time to do it, but the longer-term impact of doing it right is 10 times greater than the short-term impact of getting a sale for the archery industry.

82. An Archery Products retailer and member of buying group ARRO stated, "[w]e have to educate our dealers about holding to the MAP as much as they can . . . [o]therwise [violators will] destroy the brick-and-mortar stores." This same retailer went on to note two "MAP Issues": (i) "Many sellers dodge MAP by selling a product and offering a $50 coupon or gift card. They sell the product so low that other retailers can't compete;" and (ii) "Some manufacturers take the time and trouble to create MAP policies only to find they can't enforce them. That's really disappointing."

83. These and other comments reveal the goal of Defendants' MAPs—to stifle competition and artificially raise prices at the expense of consumers. Moreso, the comments highlight the pivotal role the ATA plays in this conspiracy:

> "It will take the ATA's power to educate retailers and manufacturers about the importance of upholding MAP policies," Stubstad said. "The cost of business continues to rise. For business to survive, we can't give our products and services away. Manufacturers must approach this problem like its enforcement and be determined to enforce their policies."

84. TRU's Director of Operations, Ben Summers, and Vice Chairman of the ATA Board of Directors discussed MAPs from the perspective of a "large manufacturer." Mr. Summers noted the primary difficulty with effectuating their scheme was that a lack of vigorous enforcement would give competitors the opportunity to "cheat" on the agreement and steal sales by offering consumers better prices on Archery Products. Mr. Summers explained, "If I'm really good at keeping my products at the MAP price, and I have a competitor who isn't keeping a MAP policy, and their product costs less than mine, I can lose lots of sales."

85. Bruce Hudalla explained MAP and ATA's role from the perspective of a sales representative:

> MAP is a good thing for the archery industry . . . . It keeps a level playing field and allows people to compete on product knowledge and customer service. As a sales rep, I support MAP because it maintains the value of products and allows my customers—retailers and manufacturers—to operate at profitable margins . . . .
>
> ATA has done an excellent job getting all the main players from retailers to manufacturers to sales reps in the same room and presenting the facts

and sample policies, [and that] [i]f you have a [MAP] policy, it must be enforced.

86. Jay Scholes, co-founder of the marketing firm, Outtech, noted "we're responsible for upholding our sport, for making sure our retailers make money, and ensuring manufacturers also make money. MAP is a good thing for our industry." Mr. Scholes concluded, "[i]f we all believe we're in this business because we love the outdoors, we have a responsibility to uphold MAP to strengthen the industry."

87. Just like earlier trade shows, the 2016 ATA Trade Show featured a presentation on MAPs by an Archery Products retailer, remarking that "many dealers might not know how to price certain products, but MAP helps them learn what profit margin they need to make their business survive," and "We have to educate our dealers about holding to the MAP as much as they can . . . . Otherwise [violators will] destroy the brick-and-mortar stores." Another attendee added, "The archery industry is uniting as one, understanding we are all in this together, and that unity is ultimately what will help us grow."

88. Throughout 2016, the ATA continued to produce and maintain information and resources for "Members Interested in MAP Policies," including "ATA resources about creating a MAP policy for your employer." These resources were only available to "ATA members" and were included in the price of membership.

89. In May 2016, nearly 40 ATA Retail Council members met for a "strategic-planning" meeting, including Council Chairman and Jay's Sporting Goods General Manager Mark Copeland. An August 30, 2016, article by *Inside Archery* included reflections on this meeting from Mr. McAninch and Mr. Copeland. Mr. McAninch noted

that, "Things are changing...It's clear from our strategic planning meeting that our industry understands that its success depends largely on the success of archery and bowhunting retailers. The ATA's Retail Council is rejuvenated, highly engaged and ready to help force a better future for everyone in our industry." Mr. Copeland emphasized the ATA Retail Council's pivotal role for obtaining industry-wide agreements: "I keep hearing that retailers are the industry's backbone. I'm appealing to every archery retailer to use our backbone to step up and be part of the solution."

90. MAP adoption and enforcement continued into 2017 with an ATA article titled, "ATA Members Speak: Marketing, MAP, and What's Next," noted that MAP "enforcement is a hot topic these days," and asked, "What's your take on MAP and why?" One archery retailer responded:

> We appreciate MAP policies and the companies that enforce them. When a company competitor enforces a MAP policy, we can stay profitable without having the showroom for a competitor who wants to undercut pricing. We started to discontinue stocking manufacturers who do not have MAP policies and don't enforce them, and those who supply Amazon.

91. In July 2017, the ATA Board of Directors met at Hoyt headquarters and unanimously agreed to add an additional two seats for Archery Products buying groups, National Archery Buyers' Association ("NABA") and the Archery Range and Retailers Organization ("ARRO"). With these additions, ATA's Board of Directors now consisted of "three pro shops, two buying groups, one sales representative, two multi-channel retailers, and 12 archery and bowhunting manufacturers and distributors."

92. ARRO's executive secretary emphasized ATA's crucial role in "growing archery and bowhunting in recent years," as well as its significant efforts to help "retailers

be more profitable." ARRO's executive secretary further explained that ARRO's goal with the board appointment was to strengthen the relationship and communication between ARRO, ATA, and manufacturers.

93. Shortly after the board meeting, the ATA published an article titled, "MAP: What is it? Why Does it Exist?" The article reiterated and expanded on ATA's long signaled position that the industry should adopt MAPs and provide assurance to competitors that they will do the same. The article explained that MAPs "level the playing field for all retailers and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices. The policies also help manufacturers protect their integrity, maintain their worth and stabilize their brand." The article also warned of the dangers price competition posed to Archery Products suppliers: "small-business owners with brick-and-mortar shops lose business because they can't compete with online markets where consumers can easily compare prices with their smartphone or desktop computer." The article continued, "Eventually, the archery industry itself suffers, which has widespread impacts, built as it is on a foundation of manufacturers and retailers supporting hunting, conservation and recreational shooting."

94. The ATA went on to explain that "ATA members regularly weigh in on MAP, and the conversation continues. While the ATA works with manufacturers to establish and enforce good MAP policies, you can get involved in several ways."

95. The ATA outlined a list of actions members could implement to address price competition. First, ATA encouraged members to "[s]tart by following good MAP policies, which means those enforced by manufacturers." The ATA further encouraged

members to call manufacturers that do not have or enforce MAPs and "express your concerns. Encourage them to work with the ATA to develop a MAP policy or improve their current policy."

96. The article also features a clear conspiracy signaling statement from Ryan Shutts, Cabela's Merchandising Director and an ATA Retail Council member: "every business in the industry must work together as a group to be productive and profitable, which includes strong MAP policies and procedures."

97. The article also emphasized the inflated profits Archery Products suppliers could reap from consumers by collectively implementing and enforcing MAPs:

> [MAP policies] help retailers stay in tune with the market and margin expectations. In other words, if you understand and follow a manufacturer's MAP policy, you'll be better positioned to make more money and run a successful business . . . .
>
> If you follow MAP and work within that price structure . . . .[then t]hat puts you in a better position financially than cutting the cost of a product and disobeying MAP policies, which can have big consequences . . . .
>
> When you're part of the solution, you'll make more money.

98. In October 2017, ATA rolled out additional MAP resources as part of its introduction of the "MAP Resource Library." The corresponding press release stated:

> ATA staff are compiling manufacturers' MAP policies and positing them in the Members-Only area of the ATA website. This MAP Resources Library helps retailers learn which manufacturers have MAP policies, and helps retailers to understand and comply with them. Several policies are already posted, and the ATA will add more as manufacturers provide them.
>
> If you're a manufacturer and need help monitoring how well retailers adhere to your MAP policy, the ATA can help you, too. MAP policies are only effective if they're enforced, but monitoring and enforcing them can be

> challenging. To help, ATA has secured special discounts with firms that monitor and enforce MAP policies. These discounts are available only to ATA-member manufacturers.
>
> The ATA has asked all ATA-member manufacturers to provide their policies so they can be included in the MAP Resource Library. If your company has a MAP policy, or if you have questions, contact Wesley Lang, ATA membership manager, at @archerytrade.org. To capitalize on these ATA-member benefits, join the Archery Trade Association today.

99. In addition to providing a central repository for MAPs of all ATA members, the MAP Resource Library functioned as a conspiratorial hub where competitors functionally signed an agreement not to compete with one another on price for Archery Products.

100. Absent an agreement or the ATA's facilitation, Archery Products suppliers could not institute price floors because they could not be certain that their competitors would not undercut their pricing and steal business. (Indeed, absent an anticompetitive agreement, Archery Products manufacturers would expect just the opposite: price competition.) Compiling and publishing all ATA member MAPs thereby ensured compliance: ATA members now had a complete list of "competitors" that would not compete on price.

101. Defendants TrackStreet and Oris offer digital platform programs that enable users to track and enforce pricing policies, including MAPs.

102. In 2019, the ATA described TrackStreet and Oris as providing "'web-crawlers' and other high-tech software to scour the internet for MAP violators." The article further explained that TrackStreet and Oris "know how to find out who's violating

[MAP], identify their fictitious names, and track them as they move around to undercut our members."

103. The services TrackStreet and Oris were advertising to ATA members included violator identification to non-violators, notices to MAP violators, and tracking information and analysis related to seller violations, such as when and how often the seller engaged in MAP violations.

104. The cost of obtaining similar services can exceed $1000 per month, and for mid-size companies can exceed $20,000 per year.

105. In addition to the MAP Resource Library, the ATA added (but has since deleted) a webpage specifically for MAPs. The webpage described in transparently anticompetitive terms how a MAP policy "ensures all retailers compete fairly and evenly on service instead of price." The webpage also outlined ATA's position that "[r]etailers are responsible for knowing MAP policies and adhering to them."

106. In May 2018, the ATA Retail Council met near Alma, Wisconsin. This meeting included conversations about the topics that they anticipated retailers would address on ATA Connect. One of these topics included "Minimum advertised price policies."

107. The ATA continued to stress the importance and required collective enforcement aspect of MAPs through posts, articles, and podcasts in 2019.

108. For example, on January 12, 2019, Twitter and Facebook posts, both shown below, the ATA compared MAP enforcement to a never-ending coyote hunt:


Archery Trade Association
@ArcheryTrade_

Companies with effective MAP programs set clear policies and enforce them as if they're hunting coyotes, which means the season never ends and the challenge never dies. bit.ly/2HbSQaO

3:00 PM · Jan 12, 2019


Archery Trade Association - ATA
January 12, 2019 ·

Companies with effective MAP programs set clear policies and enforce them as if they're hunting coyotes, which means the season never ends and the challenge never dies.
https://bit.ly/2HbSQaO

ARCHERYTRADE.ORG
Effective MAP Programs Mean Nonstop Enforcement
Enter Site

25 2 shares

109. These posts linked to an article titled, "Effective MAP Programs Mean Nonstop Enforcement." In the article, the ATA "urge[d] retailers and distributors to notify manufacturers of [MAP] violations, and provide as many specifics as possible." The ATA further explained, "The big thing will always be communication and teamwork . . . . Enforcing MAP will never get easier. That's why it's so important for ATA members to work together as much as possible."

110. Defendants had achieved wide-spread acceptance and use of agreed upon MAPs by at least 2019. As a direct and proximate result, Defendants were able to obtain significant profits from artificially inflated Archery Products prices—all at Plaintiffs' expense. Indeed, in a 2019 ATA article, TRU's Ben Summers boasted that the company's "'really high sales the past year" resulted from "good MAP policies and relentless enforcement." Similar to TRU's MAP policy, Kinsey's described its 2019 MAP policy in strict and unforgiving terms: "When someone breaks the rules, they lose the ability to buy that product from us. They also can't buy it online or through the manufacturer because we work closely with our vendors to build a 'do-not-sell' list." Kinsey's further explained that "[i]f your company has fallen below MAP prices, you will be restricted from purchasing these products from Kinsey's South effective immediately."

111. To continue to reap the margins resulting from artificially inflated Archery Products prices, ATA emphasized the constant need to police MAPs and expose and punish retailers or distributors who attempt to compete on price. As ATA's Director of Industry Relations, Kury Smith explained, ensuring MAP policy compliance is "a constant whack-a-mole or cat-and-mouse game with people who just want to make a quick buck" and people "who aren't worried about long-term profitability." Smith further stressed the need for concerted action: "The big thing will always be communication and teamwork" because "[e]nforcing MAP will never get easier. That's why it's so important for ATA members to work together as much as possible."

112. On March 20, 2019, Mr. Smith hosted TrackStreet's Ryan Erickson on ATA's podcast, "Beyond the Bow," in an episode titled, "MAP Policies and Enforcement."

Mr. Erickson explained collective action was necessary for MAPs to effectively inflate prices, noting that "nobody wants to be the first soldier through the way . . . they tend not to turn out too well . . . [but] as soon as a couple of big brands hop on, then all of a sudden that provides an umbrella coverage for the rest of the brands to move forward."

113. Defendants continued to use the ATA and other industry media to signal to the market and their co-conspirators the cause precluding competition and raising prices via MAPs.

114. In 2020, ATA CEO Matt Kormann published a blog post titled "CEO Blog: Importance of MAP," writing:

> Buying habits have also changed for consumers and business owners. We can't turn back the clock and delete the internet—no matter how appealing that might sound, especially to parents. That evolution keeps MAP in a spotlight. With just a couple of taps on an iPhone we can pull up our competitors' retail pricing. For pro shops, that means it's easier to identify potential violations of MAP policies.
>
> The first reaction might seem obvious: Manufacturers with solid MAP policies should be out there policing their retail channels. The reality is more complex. Doing so takes time and resources during a stretch in our industry where both are running at premiums. It might be even more simple to assume every retailer should just follow those policies, but as long as we live in a free and competitive market, some business owners will make decisions others do not like.

115. The January 2020 edition of *Inside Archery* re-published previous quotes by Kinsey's Justin Gorman who explained Kinsey's extensive efforts to discipline violators: "When someone breaks the rules, they lose the ability to buy that product from us. They also can't buy it online or through the manufacturer because we work

closely with vendors to build a 'do-not-sell' list." Mr. Gorman went on to explain that "Everyone needs to pull their own weight, but we are doing all we can to help protect the honest shops that don't violate MAP, which are the shops that actually get hurt when someone else breaks the rules."

116. Defendants continue to signal and otherwise reaffirm their commitment to the conspiracy. This has the effect of both enabling compliance by those already in agreement, as well as encouraging additional members to join. For example, in March 2020, PSE General Manager was quoted in an *Insider Archery* article stating:

> The industry is in a hard place, but we are not going to wait for anyone else to fix it for us. We are going to make it part of PSE's business strategy to drive improvement and fix everything we can. And we are doing all of this while fully acknowledging that if we are successful, then we are also benefiting our competitors.

117. In the December 2020 edition of *Inside Archery*, Performance Archery's Manager, Phaen Pittman, offered that the "purchasing side is where we put a major emphasis on who we do business with and why . . . . We're constantly researching to find the best products, backed by companies with strong MAP policies and good dealer margins."

118. Beginning in 2021, after creating a public record of the price-fixing conspiracy within the Archery Products market, the ATA began erasing references to its central role in the conspiracy across its website. In a further act of concealment, the ATA began publicly encouraging its members to call to discuss any MAP questions rather than create a further written record.

119. In 2022, the ATA launched a members-only ATA Retail Business Tracker Survey, which served as another mechanism for Defendants to conspire by engaging in the clandestine sharing of competitive sensitive information.

120. A subsequent article published on the ATA's website, titled "ATA Members Capitalize on Data Shared in ATA's Retail Trend Tracker Survey," outlined the process and goals of the survey and explained that it hopes its members would utilize the survey data to compare their businesses with competitors.

121. Another ATA article, titled "Download the Latest ATA Retail Trend Tracker Survey for Valuable Data about Market Trends," outlined just how detailed the data being offered is, and included: (i) the percentage of merchandise sales by product category, types of bows, price ranges of bows, customer experience level, and foot traffic; (ii) seasonal questions regarding what is trending and what is not trending; (iii) business challenges and customer feedback; and (iv) which price range customers are preferring; (v) and the percentage of sales of each product type, including bows, accessories, and services, such as coaching or bow technician work. Indeed, the ATA itself declared that "[t]his data allows you to see how your shop compares to your peers."

122. Leaving no room for doubt, additional advertisements confirm that the ATA's intent behind releasing this type of data was reduced price competition. Indeed, the ATA completed a similar survey concerning ATA members' prices for repairs and servicing of Archery Products and advertised it as a way for members to "compare your service and labor rates to industry averages so you can see how you stack up against your peers." An accompanying ATA article confirmed this is exactly how ATA members

used the data. In response to the question, "What do you charge for your services?" one member replied, "Not enough. I was happy to see the bow-tech price comparison chart at the ATA show this year, and have intended to analyze what we charge and restructure it." The article concluded with a signal to members not to "sell yourselves short" and to "price your work accordingly."

123. The Retail Business Tracker remained ATA member-exclusive until sometime in 2024. Until then, the survey compiled competitively sensitive information from ATA Board Members and distributed it to competing retailers, manufacturers, and distributors in the Archery Products business.

124. Until 2024, these reports were completely unavailable to consumers. Now, consumers and other non-members can gain access to this data, but they must pay between $200 to $500 per report, creating a substantial barrier to access. ATA members continue to receive these reports for free.

125. The ATA continues to urge and signal competitor acceptance and strict MAP policy discipline. Barb Terry, Customer Relations and Training Director at TenPoint Crossbow Technologies, said, "Smaller dealers can't compete with people who drop their prices below MAP. If they notify us, we'll follow up on it. We don't want to see someone [competitors] take money out of our customers' pockets." The article further explained that the "ATA has supporting members who can automate [the process of finding violators] so it's not so labor-intensive for the manufacturers."

**IV. Defendants succeeded in their anticompetitive conspiracy.**

126. Defendants' agreements to artificially raise, fix, maintain, or otherwise stabilize prices for Archery Products and to exchange competitively sensitive information regarding Archery Products has had the intended and foreseeable effect of artificially raising the prices Plaintiffs and Class Members pay for Archery Products.

127. The Defendants' horizontal agreement between would-be competitors and vertical agreement up and down the supply chain to raise prices through the implementation and enforcement of MAPs actually did raise prices with two mechanisms:

128. First, when MAPs are adhered to by a large number of horizontal competitors, it eliminates the ability of these would-be competitors to publicly advertise lower prices and thus attract more customers (as it would in a competitive market). Irrespective of whether a retailer may ultimately offer below MAP pricing to an Archery Products consumer by different means, such as a coupon or discount, MAPs prohibit the advertisement of this lower price. Therefore, there is no incentive for these would-be competitors to lower their prices when there is a slim chance the lower price will be recouped by a higher sales volume.

129. Second, even if some retailers do end up offering these discounts or coupons on MAP prices, the industry-wide adoption of one price set unilaterally by the specific manufacturer would operate to artificially inflate the "starting point" price from which any such discounts would be calculated. This means that the actual price of the Archery Products that would be discounted in some way from the MAP pricing will still most likely be higher than the would-be competitive price of these Archery Products by the design of Defendants' anticompetitive conduct and/or conspiracy.

130. The ATA itself continued to encourage its members (including Defendants) to adopt and strictly enforce MAPs. The ATA largely contended that MAPs ensure all retailers compete fairly and evenly on service instead of price.

131. Defendants' conspiracy to fix prices within the Archery Products industry has achieved its intended effects, and those effects are displayed through statements made by the ATA and its members.

132. NABA, previously holding seats on the ATA's Board of Directors, stated that its members strive for a minimum of 40% profit based on the manufacturer's MAP.

133. Another retailer detailed the effects of the *de facto* price floors by claiming that most "archery shops are in areas where bow pricing is highly competitive from shop to shop. We all want to get the sale, but fortunately manufacturers set MAP pricing on bows, which mostly prevents one shop from grossly undercutting another on pricing. That way, we all get a piece of the pie."

134. Similarly, Defendants' exchange of key information had the effect of harming competition within the Archery Products market. This information exchange eliminates competition by removing the veil between retailers on prices, supply, demand, inventory, and other key factors, which would normally force retailers to compete with one another by offering lower prices to make the sale.

135. The ultimate result is that Plaintiffs and Class members paid and pay more for Archery Products than they would in a competitive market.

136. Courts analyzing allegedly collusive behavior may also consider, what are commonly known as "plus factors." Generally plus factors are circumstantial evidence that goes beyond simple parallel conduct to suggest an illegal conspiracy.

137. The plus factors that exist in this matter include: (1) high barriers to entry; (2) the fungibility of Archery Products; (3) a motive and opportunity to conspire by the Defendants; (4) the Defendants' exchange of competitively sensitive information; and (5) actions and conduct that would be against the Defendants' unilateral self-interest in the absence of an anti-competitive agreement.

138. As evidenced throughout this Complaint each of those plus factors is at play in this matter. The barriers to starting a manufacturing or retail business, of these specific products and finding the customer base is naturally a deterrent. Meanwhile, the Archery Products at issue here are relatively fungible with each other. The motive and opportunity to collude in the creation and enforcement of the MAPs as well as in the exchange of information is detailed within.

## **RELEVANT MARKET**

139. To assess the effects of Defendants' unlawful and anticompetitive conduct, a relevant market must be defined. A relevant market for goods contains both a product dimension (*i.e.*, the product market) and a geographic dimension (*i.e.*, the geographic market). Here, the product market is the market for Archery Products, and the geographic market is the United States and its territories. *See infra* Class Allegations.

140. As alleged herein, the MAPs that were created and enforced by Defendants applied to most items and price points of most Archery Products.

141. Further, Defendants hold market power for all Archery Products. As alleged herein, Defendant manufacturers make some of the most well-known brands in the Archery Products industry, including throughout the entire geographic market. Further, Plaintiffs describe the power Defendant manufacturers consistently held over the ATA, while holding seats on the ATA Board of Directors throughout the Class Periods, which only increased manufacturers' influence over the Archery Products market.

142. Moreover, Defendant retailers are some of the largest sellers or suppliers of Archery Products in the entire geographic market. The conception of the conspiracy was in large part due to the appointment of Defendant retailers Bass Pro Shops and Cabela's to the ATA's Board of Directors. As alleged herein, Defendant retailers also had power over the ATA, by consistently holding seats on the ATA's Board of Directors and ATA Retail Council throughout the Class Periods, which only increased retailers' influence over the Archery Products market.

143. One of the primary ways these Defendant retailers could compete for consumer sales is through price, which is the exact component that Defendants all sought to fix through their conspiracy. Defendants' MAP creation and enforcement eliminates competition within the Archery Products industry and avoids the "race to the bottom"—*i.e.*, consumer price reductions—that would have occurred had Defendants allowed themselves to participate in a legal, competitive market with one another.

144. Moreover, competition is harmed when would-be competitors collude and exchange key information such as financial data, prices, inventory levels, and sales strategies. When these items are shared amongst would-be competitors, any incentive to lower the price out of uncertainty of what the next manufacturer, distributor, or retailer will offer is diminished.

145. Defendants' exchange of key information did, in fact, harm competition. Through the platform and tools created, including but not limited to ATA Connect and the ATA Retail Growth Interact Channel, the ATA encouraged Defendants to share ideas and ask questions amongst each other, including about buying patterns, profit margins, and service fees. The ATA marketed these resources as ways to help address industry challenges, boost Defendants' bottom line, and promote archery and bowhunting, and Defendants used the information obtained from these resources to create and enforce MAPs across the entire Archery Products market.

146. Defendants thus relied on the sharing of competitively sensitive information to eliminate independent pricing and to establish mechanisms for punishing defectors from the conspiracy who might otherwise revert to price competition.

147. Defendants' exchange of key information through ATA channels, platforms, resources, events, and bodies, including the Board of Directors and Retail Council, continues to allow Defendants, both individually and collectively, to monitor each other's sales, pricing, inventory, and other key items to ensure MAPs are followed and everyone is upholding the agreed-upon conspiracy.

148. Further, where Defendants fix prices through MAPs and restrict fair

competition to service instead of price, the value of the key information exchanged through the ATA becomes vastly more valuable.

149. Defendants' conspiracy to fix prices of Archery Products through the adoption, implementation, and enforcement of industry-wide MAPs by exchanging key information continues today. The ATA continues to endorse and advocate for its members to develop MAPs while also pushing for technology and software to track when MAPs are being violated. Thus, Defendants and their co-conspirators continue to express and signal to one another their continued commitment to the price-fixing agreement.

## STATUTE OF LIMITATIONS AND TOLLING

150. Generally, consumers are unaware of MAP strategies or how manufacturers, distributors, and retailers set advertising and sales prices for each product offered. Consumers are equally unaware that the archery industry has a business association with over 1000 members that facilitates the collusion of these members in an effort to raise and fix artificially the prices that consumers pay.

151. Plaintiffs had no actual or constructive knowledge of Defendants' anticompetitive scheme until, at the earliest, May 30, 2025, when the first class-action complaint was filed against manufacturers, distributors, retailers, and other archery industry participants in *Santarlas v. Hoyt Archery, Inc., et al*, D. Utah 2:25-cv-00436-DAK. Before that filing, Plaintiffs possessed insufficient information to conclude or suspect that Defendants had engaged in anticompetitive conduct to increase and maintain their

Archery Product prices, and thus, they had no duty to inquire into the legality of Defendants' conduct.

152. Moreover, even if Plaintiffs had a duty to investigate Defendants' conduct before May 30, 2025, Plaintiffs could not have discovered through the exercise of reasonable diligence the existence of Defendants' anticompetitive scheme as alleged herein before that date. Defendants' anticompetitive scheme was self-concealing in that Defendants did not allow consumers access to any insider data, insight, lessons, or other key information used to set MAP pricing and collude with other industry suppliers.

153. Further, each purchase of an Archery Product subject to MAP pricing is a new overt act causing injury to Plaintiffs and the Classes.

154. Accordingly, Plaintiffs' and Class Members' claims were tolled by the discovery rule, Defendants' fraudulent concealment, and the continuing violations doctrine.

## CLASS ALLEGATIONS

155. Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), Plaintiffs Montpetit and Tapia bring this action for injunctive relief under the Sherman and Clayton Acts on behalf of themselves and on behalf of all others similarly situated as proposed representatives of a class of indirect purchasers defined as:

> Any person in the United States who indirectly purchased new Archery Products manufactured by any Defendant from any distributor or retailer who did not participate in the alleged conspiracy from January 1, 2014, to the present.

This class may be referred to as the "Indirect Purchaser Plaintiff Injunctive Relief Class," "IPP Injunctive Relief Class," or simply the "Injunctive Relief Class."

156. Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(c)(4), Plaintiffs Montpetit and Tapia bring this action for damages under various state antitrust and consumer protection laws on behalf of themselves and on behalf of all others similarly situated as proposed representative of a class of indirect purchasers defined as:

> All persons and entities residing in Arizona, California, Colorado, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, West Virgina, or Wisconsin who indirectly purchased new Archery Products manufactured by any Defendant from any distributor or retailer who did not participate in the alleged conspiracy from January 1, 2014, to the present.

This class may be referred to as the "Indirect Purchaser Plaintiffs' Damages Class," "IPP Damages Class," or simply the "Damages Class."

157. For grammatical convenience the Injunctive Relief Class and the Damages Class may be referred to collectively either as "the Classes" or the "the Class."

158. The period from January 1, 2014, to the present may be referred to as the "Class Period."

159. The Class members are so numerous that joinder of all members would be impracticable. While the exact number of Class members is unknown, given the commerce at issue, there are likely thousands if not tens of thousands of Class members.

160. Plaintiffs' claims are typical of those of the Classes.

161. Plaintiffs will fairly and adequately protect and represent the interests of the Classes. The interests of the Plaintiffs are aligned with those of the Classes.

162. Questions of law and fact common to the Classes will prevail over individual questions because Defendants have acted on grounds generally applicable to the Classes.

163. Questions of law and fact common to each Class include but are not limited to:

a. whether Defendants and co-conspirators intentionally and unlawfully impaired or impeded competition in the relevant market;

b. whether Defendants and co-conspirators engaged in a contract, combination, or conspiracy to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States or its territories;

c. whether Defendants' and co-conspirators' conduct caused the prices of Archery Products sold in the United States or its territories to be sold at artificially high and supra-competitive levels;

d. whether the Plaintiffs and other members of the Classes were injured by Defendants' and co-conspirators' conduct and, if so, the appropriate class-wide measure of damages for Class members;

e. the scope of any injunctive relief to which Plaintiffs and the other members of the Classes are entitled; and

f. the proper measure of Damages.

164. Class action treatment is superior to individual actions and the fair and efficient adjudication of the controversy because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the need for unnecessarily duplicative efforts and expenses. Additionally, the benefits of proceeding as a class action, including but not limited to providing injured persons with a method for obtaining relief for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in connection with managing this class action.

165. Plaintiffs are not aware of any difficulties in the maintenance of this action as a class action.

166. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## ANTITRUST INJURY

167. Defendants' anticompetitive conduct had the following effects, among others:

a. Price competition has been restrained or eliminated with respect to Archery Products;

b. The prices of Archery Products have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c. Indirect purchasers of Archery Products have been deprived of free and open competition; and

d. Consumers of Archery Products who indirectly purchased their equipment paid artificially inflated prices.

168. The Archery Products that Plaintiffs and Class members purchased were in substantially the same form as when they were initially sold by Defendants. As a result, (i) the Archery Products follow a traceable physical chain from Defendants to Plaintiffs and the Class and (ii) overcharges on Archery Products can be traced from Defendants to Plaintiffs and the Class.

169. The purpose of the conspiratorial conduct of Defendants was to raise, fix, or maintain the price of Archery Products and, as a direct and foreseeable result, Plaintiffs and the Class paid supra-competitive prices for Archery Products during the Class Period.

170. Plaintiffs and the Class have sustained injury to their property and suffered damages by having paid higher prices for Archery Products than they would have absent the Defendants' illegal and anticompetitive conduct.

171. This is an injury of the type that the antitrust laws were meant to punish and prevent.

## CAUSES OF ACTION

### I. Violation of the Sherman and Clayton Acts

172. This cause of action is asserted by Plaintiffs on behalf of themselves and the Injunctive Relief Class against all Defendants.

173. Plaintiffs incorporate each prior paragraph as though fully set forth here.

174. The relevant product market is the Archery Products Market.

175. The relevant geographic market is the United States.

176. Beginning as early as January 1, 2014, and continuing to the present, Defendants entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Archery Products in the United States and its territories to supra-competitive levels in violation of Sections 1 and 3 of the Sherman Act.

177. Defendants agreed between and among themselves to exchange competitively sensitive information, such as prices, output, supplies, costs, and purchasing and sales strategies.

178. Defendants' exchange of information has had the intended anticompetitive effects, including but not limited to: (i) raising, fixing, maintaining, or stabilizing prices of Archery Products at an artificially high level; and (ii) eliminating or suppressing, to a substantial degree, competition among the Defendant manufacturers or retailers in the relevant product and geographic markets.

179. Each named Defendant has participated in one or more overt acts on information and belief in furtherance of the exchange of information.

180. Defendants' conduct is unlawful under the *per se* standard, while also being unlawful under a rule of reason analysis. Defendants' horizontal price-fixing agreement is facially anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

181. As a direct and proximate result of Defendants' contract, combination, or conspiracy alleged herein, the following effects have occurred, among others:

a. price competition has been restrained, suppressed and/or eliminated within the United States and its territories for the sale of Archery Products;

b. prices for Archery Products sold by Defendant manufacturers and/or retailers have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States and its territories; and

c. those who purchased Archery Products indirectly from Defendant manufacturers or retailers have been deprived of the benefits of free and open competition.

182. Plaintiffs and Class members have been injured and will continue to be injured in their businesses and property by paying more for Archery Products purchased from Defendant manufacturers or retailers or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

183. Plaintiffs and the Class are threatened with future injury to their property unless Defendants are enjoined from further unlawful conduct.

184. Plaintiffs accordingly seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws to correct for the anticompetitive market effects caused by Defendants' unlawful conduct and to assure that similar anticompetitive conduct and effects do not continue or recur in the future.

## II. Violations of State Antitrust Laws

185. This cause of action is asserted by Plaintiffs on behalf of themselves and the Damages Class against all Defendants.

186. Plaintiffs incorporate each prior paragraph, except those in this Causes of Action section, as though set forth fourth here.

187. Beginning as early as 2014 and continuing through to the present, Defendants have entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Archery Products in the United States to supra-competitive levels in violation of the state antitrust laws incorporated below.

188. Defendants agreed between and among themselves to exchange competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies.

189. Defendants' exchange of information has had the intended anticompetitive effects, including but not limited to: (i) raising, fixing, maintaining, or stabilizing prices of Archery Products at an artificially high level; and (ii) eliminating or suppressing, to a substantial degree, competition among the Defendants in the relevant product and geographic markets.

190. By engaging in the foregoing conduct, Defendant intentionally and wrongfully engaged in conduct, a combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases

of Archery Products in violation of Ariz. Rev. Stat. §§ 44-1401 *et. seq.* by Class Members and/or Arizona residents.

b. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of Cal. Bus. & Prof. Code §§ 16700, et. seq. by Class Members and/or California residents.

c. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of D.C. Code §§28-4501, *et. seq.,* by Class Members or District of Columbia residents.

d. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of Haw. Rev. Stat. §§ 480-1, *et. seq.,* by Class Members or Hawaii residents.

e. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of 740 Ill. Comp. Stat. Ann., *et. seq.,* by Class Members or Illinois residents.

f. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of Iowa Code §§ 553.1, *et. seq.,* by Class Members or Iowa residents.

g. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of Kan. Stat. Ann. §§ 50-101, *et. seq.,* by Class Members or Kansas residents.

h. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of Me. Rev. Stat. Ann. Tit. 10§§ 1101, *et. seq.,* by Class Members or Maine residents.

i. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of Mich. Comp. Laws §§ 445.772, *et. seq.,* by Class Members or Michigan residents.

j. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of Minn. Stat. §§ 325D.49, *et. seq.,* by Class Members or Minnesota residents.

k. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of Miss. Code Ann. §§ 75-21-1, *et. seq.,* by Class Members or Mississippi residents.

l. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases

of Archery Products in violation of Neb. Rev. Stat. §§ 59-801, *et. seq.,* by Class Members or Nebraska residents.

m. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of Nev. Rev. Stat. Ann. §§ 598A.010, *et. seq.,* by Class Members or Nevada residents.

n. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of N.H. Rev. Stat. Ann. Tit. XXXI, §§ 356, *et. seq.,* by Class Members or New Hampshire residents.

o. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of N.M. Stat. Ann. §§ 57-1-1, *et. seq.,* by Class Members or New Mexico residents.

p. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of N.Y. Gen. Bus. Law §§ 340, *et. seq.,* by Class Members or New York residents.

q. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of N.C. Gen. Stat. §§ 75-1, *et. seq.,* by Class Members or North Carolina residents.

r. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of N.D. Cent. Code §51-08.1, *et. seq.,* by Class Members or North Dakota residents.

s. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of Or. Rev. Stat. §§ 646.705, *et. seq.,* by Class Members or Oregon residents.

t. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of R.I. Gen. Laws §§ 6-36-1, *et. seq.,* by Class Members or Rhode Island residents.

u. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of S.D. Codified Laws §§ 37-1-3.1, *et. seq.,* by Class Members or South Dakota residents.

v. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of Tex. Bus. & Com. Code § 15.01 *et seq.*, by Class Members or Texas residents.

w. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases

of Archery Products in violation of Utah Code Ann. §§ 76-15-5, *et. seq.,* by Class Members or Utah residents.

x. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of W. Va. Code §§ 47-18-1, *et. seq.,* by Class Members or West Virginia residents.

y. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade with respect to indirect purchases of Archery Products in violation of Wis. Stat. §§ 133.01, *et. seq.,* by Class Members or Wisconsin residents.

191. Plaintiffs and Class Members are entitled to recover damages as permitted by law for their injuries caused by Defendants' violations of the respective statutes identified above.

## III. Violations of Consumer Protection and Deceptive Trade Practices Statutes

192. 1This cause of action is asserted by Plaintiffs on behalf of themselves and the Damages Class against all Defendants.

193. Plaintiffs incorporate each prior paragraph, except those in this Causes of Action section, as though fully set forth here.

194. Defendants engaged in unfair competition or unfair acts or unconscionable acts or practices in violation of the state consumer protection statutes listed below.

195. By engaging in the unfair and unlawful conduct alleged in this Complaint, Defendants violated the following state consumer protection laws:

a. Defendants have engaged in unfair competition or unfair acts in violation of Ala. Code §§ 8-19-10, *et. seq.*

b. Defendants have engaged in unfair competition or unfair acts in violation of Ark. Code §§ 4-88-101, et. seq.

c. Defendants have engaged in unfair competition or unfair acts in violation of Cal. Bus. & Prof. Code §§ 17200, *et. seq.*

d. Defendants have engaged in unfair competition or unfair acts in violation of Colo. Rev. Stat. §§ *et. seq.*

e. Defendants have engaged in unfair competition or unfair acts in violation of D.C. Code §§ 28-3901, *et. seq.*

f. Defendants have engaged in unfair competition or unfair acts in violation of Fla. Stat. §§ 501.201, *et. seq.*

g. Defendants have engaged in unfair competition or unfair acts in violation of Haw. Rev. Stat. §§ 481-1, *et. seq.*

h. Defendants have engaged in unfair competition or unfair acts in violation of Idaho Code Ann. §§ 48-601, *et. seq.*

i. Defendants have engaged in unfair competition or unfair acts in violation of 815 Ill. Comp. Stat. Ann. §§ 505/1, *et. seq.*

j. Defendants have engaged in unfair competition or unfair acts in violation of Kan. Stat. Ann. §§ 50-623, *et. seq.*

k. Defendants have engaged in unfair competition or unfair acts in violation of Me. Stat. Tit. §§ 205-A, *et. seq.*

l. Defendants have engaged in unfair competition or unfair acts in violation of Mass. Gen. Laws Ch. 93A §§ 1, *et. seq.*

m. Defendants have engaged in unfair competition or unfair acts in violation of Minn. Stat. §§ 325F.68, *et. seq.*

n. Defendants have engaged in unfair competition or unfair acts in violation of Mo. Rev. Stat. §§ 407.010, *et. seq.*

o. Defendants have engaged in unfair competition or unfair acts in violation of Mont. Code §§ 30-14-103, *et. seq.*

p. Defendants have engaged in unfair competition or unfair acts in violation of Neb. Rev. Stat. §§ 59-1602, *et. seq.*

q. Defendants have engaged in unfair competition or unfair acts in violation of Nev. Re. Stat. §§ 598.0903, *et. seq.*

r. Defendants have engaged in unfair competition or unfair acts in violation of N. M. Stat. Ann. §§ 57-12-1, *et. seq.*

s. Defendants have engaged in unfair competition or unfair acts in violation of N.Y. Gen. Bus. Law §§ 349, *et. seq.*

t. Defendants have engaged in unfair competition or unfair acts in violation of N.C. Gen. Stat. §§ 75-1.1, *et. seq.*

u. Defendants have engaged in unfair competition or unfair acts in violation of N.D. Cent. Code §§ 51-10, *et. seq.*

v. Defendants have engaged in unfair competition or unfair acts in violation of R.I. Gen. Laws §§ 6-13.1-1, *et. seq.*

w. Defendants have engaged in unfair competition or unfair acts in violation of S.C. Code Ann. §§ 39-5-10, *et. seq.*

x. Defendants have engaged in unfair competition or unfair acts in violation of Tenn. Code. Ann. §§ 47-18-101, *et. seq.*

y. Defendants have engaged in unfair competition or unfair acts in violation of Tex. Bus. & Com. Code § 17.41 *et seq.*

z. Defendants have engaged in unfair competition or unfair acts in violation of Utah Code Ann. §§ 13-11-1, *et. seq.*

aa. Defendants have engaged in unfair competition or unfair acts in violation of Vt. Stat. Ann. Tit. 9, §§ 2453, *et. seq.*

bb. Defendants have engaged in unfair competition or unfair acts in violation of W. Va. Code §§ 46A-6-101, *et. seq.*

cc. Defendants have engaged in unfair competition or unfair acts in violation of Wis. Stat. §§ 100.20, *et. seq.*

196. On behalf of themselves and the State Law Damages Class, Plaintiffs seek all appropriate relief provided for under the above-identified statutes.

## DEMAND FOR JURY TRIAL

197. Plaintiffs request a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

198. For the foregoing reasons, Plaintiffs request judgment against Defendants as follows:

199. that this action may proceed as a class action, with Plaintiffs as the

designated Class Representative and their counsel as Class Counsel;

200. that Defendants have engaged in a contract, combination, or conspiracy in violation of federal and state laws and that Plaintiffs and Class Members have been injured in their business or property as a result of Defendants' legal violations;

201. that Plaintiffs and Class Members may recover damages sustained by them, as provided by the applicable state antitrust and trade practice laws, and that a judgment in favor of Plaintiffs and Class Members be entered against Defendants in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

202. that Defendants, their subsidiaries, affiliates, successors, transferees, and assignees and their respective officers, directors, partners, agents, and employees, together with all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from:

a. continuing and maintaining the combination, conspiracy, or agreement alleged herein;

b. enforcing MAPs;

c. sharing or communicating pricing and sales data, whether directly or through a third party;

d. sharing or communicating MAP policies, whether directly or through a third party;

e. marketing or selling Archery Products at prices coordinated with other manufacturers, distributors, or retailers;

203. that Plaintiffs and the Class Members be awarded pre-judgment and post-

judgment interest and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

204. that Plaintiffs and the Class Members recover their costs of this suit, including reasonable attorney fees as provided by law; and

205. that Plaintiffs and the Class Members receive all other or further relief as may be just and proper.

Respectfully submitted,

**GUERRA LLP**

Dated: December 19, 2025 By: */s/ Michael Montaño*

Michael Montaño
345 California Street, Suite 600
San Francisco, California 94104
Telephone: (726) 336-7693
Email: mmontano@guerrallp.com

*and*

**BASSFORD REMELE**
***A Professional Association***

Amanda M. Williams (MN #0341691)
Casey D. Marshall (MN #0395512)
100 South Fifth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 333-3000
Facsimile: (612) 333-8829
Email: awilliams@bassford.com

***Interim Co-Lead Counsel for the Indirect Purchaser Class***