UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 25-md-03160-PAB-TPO

MDL No. 3160

IN RE ARCHERY PRODUCTS ANTITRUST LITIGATION

---

**DEFENDANTS' JOINT MOTION TO DISMISS WITH PREJUDICE DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT (ECF 109) AND INDIRECT PURCHASERS' CONSOLIDATED CLASS ACTION COMPLAINT (ECF 110)**

---

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .......... 2

I. INTRODUCTION .......... 3

II. SUMMARY OF RELEVANT ALLEGATIONS .......... 4
- A. The Parties .......... 4
- B. The Alleged Conduct .......... 8
- C. Procedural History .......... 9

III. LEGAL STANDARD .......... 10

IV. ARGUMENT .......... 11
- A. The Complaints Do Not State Claims Under The Sherman Act .......... 11
- B. Plaintiffs Impermissibly Rely On Group Pleading .......... 25
- C. Plaintiffs' Claims Are Largely Time-Barred .......... 29
- D. IPPs Lack Article III Standing To Bring Most Of Their State Law Claims .......... 35
- E. IPPs' State Law Claims Should Be Dismissed .......... 37

V. CONCLUSION .......... 39

## I. INTRODUCTION

Plaintiffs allege that over 2,500 members of a trade association agreed to fix prices for over a decade in violation of federal and state antitrust laws and state consumer protection laws. Despite amending the Complaints once following motion practice that identified fundamental flaws with their theory, Plaintiffs still offer no direct evidence of any illicit agreement, no allegations of parallel conduct, no allegations regarding meetings or writings where the terms of this vast alleged conspiracy were set, and no admission of coordination. Instead, Plaintiffs ask the Court to infer an industry-wide conspiracy based on trade association membership and some cherry-picked publication snippets. But lawful independent business conduct is not a viable antitrust conspiracy. The Complaints should be dismissed with prejudice.

To state a claim under Sherman Act Sections 1 or 3, Plaintiffs must plausibly allege that each Defendant entered into an unlawful agreement that unreasonably restrained trade. Plaintiffs fail to do so. The Complaints target minimum advertised pricing policies ("MAPs"), which list minimum advertised prices for a particular manufacturer's product but do not restrict actual sale prices. Plaintiffs claim that Defendants conspired to adopt and enforce MAPs through the Archery Trade Association, Inc. ("ATA"), even though MAPs are ubiquitous across American industry and any manufacturer may lawfully adopt one. The existence and operation of a trade association is not a conspiracy, nor is membership in a trade association an antitrust violation.

Plaintiffs' alleged conspiracy is implausible. They posit a sprawling, 12-year scheme involving thousands of co-conspirators across the entire archery industry, from manufacturers, to distributors, to retailers. Yet Plaintiffs fail to allege any express agreement or parallel conduct among any co-conspirators, much less any of the named Defendants. Indeed, Plaintiffs do not

identify a single boycotted retailer, a single coordinated enforcement action, or any agreement to unanimously implement or abide by MAPs, much less any agreement on the terms of any MAP policy or pricing. There are no allegations that Defendants simultaneously adopted MAPs, used the same MAP terms, had MAPs that covered the same archery products, or coordinated their enforcement. Plaintiffs' alleged "plus factors" add nothing to the equation. ATA membership, attendance at industry meetings, and education regarding MAPs are lawful activities, not conspiratorial conduct. And case law has for years recognized that MAPs are perfectly consistent with lawful conduct. Because each "plus factor" is equally—if not more—consistent with lawful, independent decision-making, they cannot save Plaintiffs' claims from dismissal.

In addition to these defects, Plaintiffs' claims have other fatal flaws. Plaintiffs define an illogical product market consisting of bows, crossbows, arrows, targets, and other accessories that are not interchangeable. Plaintiffs admit that the facts underlying their Complaints were disclosed as early as 2014, rendering most of the claims time-barred. And Indirect Purchaser Plaintiffs lack standing to bring many of their state law claims or fail to meet other state-specific requirements.

Put simply, the Complaints describe conduct consistent with lawful, independent decision-making rather than a coordinated scheme to restrain trade. To survive this motion, the Complaints must contain allegations that "nudge[] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). Because Plaintiffs' amended allegations still do not cross that line, both Complaints should be dismissed in their entirety with prejudice.

## II. SUMMARY OF RELEVANT ALLEGATIONS

### A. The Parties

**The Plaintiffs.** This consolidated multidistrict litigation was brought by two plaintiff

groups: Direct Purchaser Plaintiffs ("DPPs") and Indirect Purchaser Plaintiffs ("IPPs," and together, "Plaintiffs"). DPPs are ten individuals who purchased one or more "Archery Products" subject to a MAP directly from a defendant or an alleged co-conspirator. DPP Consolidated Amended Complaint (ECF 109) ("DPPC") ¶¶ 37-46. DPPs bring claims on behalf of a purported class of "persons and entities" in the U.S. who purchased *any* "Archery Product(s)" between January 1, 2014 to the present directly from a Defendant or *any* ATA member. *Id.* ¶ 69.

IPPs are two individuals who purchased Archery Products from local stores in Wisconsin and Minnesota or from Amazon.com, rather than directly from any Defendant. IPP Consolidated Class Action Complaint (ECF 110) ("IPPC") ¶¶ 4-5. IPPs seek to represent (a) an injunctive relief class of purchasers of "new Archery Products manufactured by any Defendant from any distributor or retailer who did not participate in the alleged conspiracy" for alleged violations of Sherman Act Sections 1 and 3, *id.* ¶¶ 155, 176, and (b) a damages class of purchasers from certain states "who indirectly purchased new Archery Products manufactured by any Defendant from any distributor or retailer who did not participate in the alleged conspiracy," *id.* ¶ 156. IPPs seek damages under 25 state antitrust laws and 29 state consumer protection laws. *See id*. ¶¶ 190, 195.

Plaintiffs define "Archery Products" broadly as "products used by consumers for bowhunting or archery," including "five main product markets, submarkets, or cluster markets": (1) bows and their components; (2) arrows (minus the arrowhead) and their components, including the shaft, fletching, and nock; (3) arrowheads (or arrowpoints) including broadheads and field points; (4) targets of varying types; and (5) accessories, such as bow cases, arrow quivers, sights and scopes, and stabilizers. DPPC ¶ 76; IPPC ¶ 30.

**The Defendants.** DPPs assert claims against 17 Defendants operating at different levels

of the distribution chain—manufacturers, distributors, and retailers—along with the ATA. IPPs name 15 of those same Defendants.[1] Defendants vary in size and geographic reach, and the pleadings provide little detail about their individual businesses, advertising, or pricing practices beyond noting their membership in the multi-thousand-member ATA.

*Manufacturers.* Plaintiffs name the following manufacturers as defendants: Bear Archery, Inc. ("Bear"); Bowtech, Inc. ("Bowtech," correct legal name Bowtech, LLC); Easton Technical Products, Inc. d/b/a Easton Archery ("Easton"); Hamskea Archery Solutions LLC ("Hamskea," named only by DPPs); Hoyt Archery Inc. ("Hoyt"); Mathews Archery, Inc. ("Mathews"); Precision Shooting Equipment, Inc. ("PSE"); Hunter's Manufacturing Company, Inc. d/b/a TenPoint Crossbow Technologies ("TenPoint"); and Tomorrow's Resources Unlimited, Inc. d/b/a T.R.U. Ball / AXCEL Archery ("T.R.U. Ball Archery"). *See* DPPC ¶¶ 47-55; IPPC ¶¶ 6-13. These manufacturers differ in scale and market footprint, and the Complaints do not allege which Archery Product(s) each manufacturer sells.

*Distributors.* Plaintiffs name distributors Kinsey's Outdoors, Inc. ("Kinsey's) and Lancaster Archery Supply, Inc. ("Lancaster") as defendants, alleging that they distribute outdoor goods, including Archery Products, to retailers in the United States. DPPC ¶¶ 62-63; IPPC ¶¶ 18, 19. Kinsey's and Lancaster also have their own retail locations and internet storefronts. *Id.*

*Retailers.* Defendant retailers include BPS Direct, LLC, d/b/a Bass Pro Shops ("Bass Pro Shops"); Cabela's LLC ("Cabela's," acquired by Bass Pro Shops in 2017 (IPPC ¶ 14)); Jay's Outdoor LLC d/b/a Jay's Sporting Goods ("Jay's," incorrectly named as "Jay Sports, Inc." (IPPC

---

[1] Plaintiffs named but later voluntarily dismissed DICK's Sporting Goods, Inc., Rogers Sporting Goods Holdings, Inc., TrackStreet, Inc., and NeuIntel, LLC. *See* ECF 147, 148, 153, 170.

¶ 17)); and Scheels All Sports, Inc. d/b/a Scheels ("Scheels"). DPPC ¶¶ 56-61; IPPC ¶¶ 14-17, 20. DPPs allege that 6,000 retail outlets in the U.S. sell archery equipment. DPPC ¶ 78. Of those, 4,500 are sporting goods stores, online retailers, and other businesses that sell archery equipment alongside other products. *Id*. The remaining 1,500 are full-time archery-only retailers. *Id*. DPPs allege that national sporting goods stores and larger pro shops source Archery Products directly from manufacturers, while smaller pro shops (comprising 80% of pro shops) generally source Archery Products through distributors. *Id.* ¶ 79.

*Archery Trade Association.* Plaintiffs name the ATA as a defendant. DPPC ¶ 64; IPPC ¶ 21. The ATA is a trade association "composed of businesses that manufacture, buy, and sell Archery Products" with over 2,500 member organizations. IPPC ¶ 40-41; DPPC ¶ 81. Plaintiffs allege that every ATA member since 2014 has participated in the alleged conspiracy. *See, e.g.,* DPPC ¶ 67 ("Co-conspirators include, but are not limited to, all other entities that were ATA members at any relevant times"); IPPC ¶ 63 ("Beginning by at least 2014 . . . the manufacturer and retailer Defendants—acting through, in concert with, or with the aid of the ATA and other co-conspirators—agreed to implement and strictly enforce" MAPs.).

The ATA's board of directors has varied in size and composition over the years. DPPC ¶ 86. Plaintiffs also allege that the ATA established its Retail Council "in or around May of 2016" to act as a strategic committee discussing "all industry happenings" including MAPs. DPPC ¶¶ 87-88; IPPC ¶¶ 48-50. The ATA's Retail Council has similarly varied in composition over the years. DPPC ¶ 90. In 2017, the ATA launched ATA Connect, an "online discussion community" that created a "members-only forum for archery-industry professionals to discuss hot topics among themselves – and work together to find solutions." DPPC ¶ 96. Plaintiffs also allege that, in 2023,

the ATA launched a quarterly Retail Business Tracker Survey that shares information about the archery industry with manufacturers, distributors, and retailers. DPPC ¶ 100. This survey has been available to the public for a fee since 2024. *Id.* ¶ 102. Plaintiffs further allege that information about pricing trends was shared on ATA forums, *see id.* ¶ 101, but do not allege that ATA Connect or the Retail Business Tracker Survey were unlawful.

**B. The Alleged Conduct**

Plaintiffs allege a massive, industry-wide price-fixing conspiracy spanning more than a decade, encompassing over 2,500 organizations across all levels of the archery distribution chain, and covering virtually all products that could be used to practice archery (and some other activities). *See* DPPC ¶¶ 76, 104; IPPC ¶¶ 62, 63, 158. Plaintiffs allege that the 17 (or 15) Defendants—along with unidentified "co-conspirators" (including every ATA member)—acted through the ATA to "fix, raise, maintain, or stabilize prices" of Archery Products via "widespread adoption, implementation, and enforcement" of MAPs and "group boycotts of industry participants" who did not join the alleged conspiracy. DPPC ¶¶ 1-4, 8-9, 104; IPPC ¶¶ 3, 59, 63.

MAPs are unilateral, manufacturer-issued policies that specify "the 'lowest price a retailer can advertise the [manufacturer's] product for sale,' including 'online or anywhere in print.'" DPPC ¶ 3. Plaintiffs allege that all Defendants "sold Archery Products subject to a MAP," DPPC ¶¶ 47-63; IPPC ¶¶ 6-20, and that the ATA "developed and promoted MAPs throughout the archery industry," IPPC ¶ 21. DPPs further allege that, "[w]hile some MAPs already existed within the Archery Products industry in the early 2000s," their use expanded with the rise of e-commerce. DPPC ¶ 107. Plaintiffs do not allege when any manufacturer initially adopted a MAP or when any distributor or retailer decided to comply with one.

MAPs do not set the lowest price at which a product may ultimately *sell*; they specify only a minimum *advertised* price. IPPC ¶ 128; DPPC ¶ 23. Plaintiffs do not identify any MAP's language, initial adoption date, or enforcement that allegedly resulted in a boycott. Also absent are allegations that any Defendant adopted identical MAPs or coordinated those policies' advertised-pricing terms. The Complaints, in fact, contain few allegations specific to any named Defendant, relying instead on broad allusions to "Defendants" as a group. *See, e.g.*, IPPC ¶ 59 ("Defendants agreed, combined, or conspired . . . ."); DPPC ¶ 104 ("[T]he ATA and Defendants agreed to work together to adopt and implement industry-wide MAPs on Archery Products . . . .").

Plaintiffs ask the Court to infer that each Defendant engaged in a price-fixing conspiracy based primarily on their ATA activities and some statements (including by non-Defendants) touting MAPs' benefits on webpages or in podcasts, social media posts, or magazine articles. DPPC ¶¶ 112-125; IPPC ¶¶ 65-99. Plaintiffs further allege that the ATA facilitated this 12-year conspiracy merely by "provid[ing] numerous opportunities for its competitor-members to meet and discuss matters of import to their shared financial interests" through ordinary trade association features—e.g., a Board of Directors, Retail Council, annual trade show, online forums and sub-communities, and an industry survey (which was publicly available for a fee). DPPC ¶¶ 83, 91, 96-97, 100, 102, 105; IPPC ¶¶ 41, 43, 61.

### C. Procedural History

This multidistrict litigation consolidates 25 actions filed against defendants across the archery supply chain. The first action was filed in the District of Utah in late May 2025. Shortly thereafter, Defendant Mathews moved to dismiss, explaining that Plaintiffs had not alleged a plausible conspiracy and had identified no facts connecting Mathews to any alleged unlawful

agreement. *Santarlas v. Hoyt Archery, Inc. et al.*, 2:25-cv-00436 (D. Utah), ECF 31 (July 10, 2025) (transferred to D. Colo. No. 1:25-cv-03620, ECF 31). In October 2025, before that motion was ruled upon, the Judicial Panel for Multidistrict Litigation transferred the first-filed actions to this Court. Plaintiffs filed amended complaints in December 2025, adding Defendants Bear, Easton, PSE, Scheels, and T.R.U. Ball Archery. Defendants move to dismiss because Plaintiffs still have not alleged an unlawful agreement or any facts plausibly connecting any Defendant to the sweeping conspiracy Plaintiffs posit, despite having had months to do so.

## III. LEGAL STANDARD

To survive a motion to dismiss, a complaint must "'state a claim to relief that is plausible on its face'" with respect to each Defendant. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570); *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012). Although courts must accept all well-pleaded factual allegations, courts "need not accept [] conclusory allegations as true." *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1231 (10th Cir. 2002). Indeed, "'[c]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based.'" *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)).

The Court's role in evaluating Rule 12(b)(6) motions is especially critical in antitrust cases given the "high costs and frequent abuses associated with antitrust discovery." *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1191 (10th Cir. 2009). That concern is acute here, where Plaintiffs allege a 12-year conspiracy with thousands of participants cobbled together from out-of-context trade association communications. "'[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual

controversy to proceed.'" *Twombly*, 550 U.S. at 558 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n.17 (1983)).

## IV. ARGUMENT

Plaintiffs' claims fail because they do not plausibly allege any unlawful agreement to fix prices through coordinated MAPs, which are lawful unilateral policies with procompetitive benefits that have existed in the archery industry since at least the early 2000s. Plaintiffs allege no direct evidence of an agreement and fail to plead facts that tend to exclude independent, unilateral decision-making. Plaintiffs' circumstantial allegations—trade association membership, "opportunities to meet" others at trade association events, and statements touting MAPs' benefits—neither plausibly allege parallel conduct nor supply any "plus factor" supporting a reasonable inference of concerted action. Plaintiffs allege conduct equally consistent with lawful, independent decision-making and, as explained below, do not state any viable claim for relief.

### A. The Complaints Do Not State Claims Under The Sherman Act

The Complaints allege violations of Sections 1 and 3 of the Sherman Act, which require (1) a contract, combination or conspiracy between two legally distinct entities, (2) in restraint of trade, (3) affecting interstate commerce. *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992); *see also Cayman Expl. Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1360 (10th Cir. 1989). Pleading an alleged agreement in a conclusory manner is insufficient. *See Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006). A plaintiff must allege enough facts to support the inference that a conspiracy actually existed. *Id.* This can be accomplished by alleging direct evidence of an agreement or by presenting circumstantial facts supporting the inference that a conspiracy existed. *Llacua v. Western Range*

*Ass'n*, 930 F.3d 1161, 1178 (10th Cir. 2019). The Complaints do neither and should be dismissed.

### ***1. MAPs Are Lawful Tools that Enhance, Not Restrict, Competition***

A MAP is a unilateral, manufacturer-imposed policy that prohibits downstream resellers from *advertising* the manufacturer's products below a specified price level. MAPs do not restrict a retailer's independent discretion to set the final price it will actually *charge* its customers. *See, e.g.*, *Campbell v. Austin Air Sys., Ltd.*, 423 F. Supp. 2d 61, 68 n.6 (W.D.N.Y. 2005) ("MAP policy" restricted "only the minimum price for which a dealer could advertise" and "explicitly state[d] that a dealer may sell [the product] for any price," and thus did not constitute an "agreement to fix prices"). MAPs apply only to the issuing manufacturer's products—not the products of competing brands—and (at most) constrain "intrabrand" rather than "interbrand" competition. MAPs are neither new nor unusual; they have been ubiquitous across many industries for decades.

MAPs fall within the "*Colgate* doctrine"—the Supreme Court rule that a manufacturer may lawfully "refuse to deal with retailers that do not follow its suggested [advertised] prices." *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 902 (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *see also Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) (businesses are "free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing" (citing *Colgate*)). Because a MAP rests on unilateral conduct, it falls outside Sections 1 and 3 of the Sherman Act. *See Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1195 (D. N.M. 2011) ("[U]nilateral conduct, regardless of anticompetitive effects, is not prohibited by § 1 of the Sherman Act." (quoting *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1256 (10th Cir. 2006)).

Beyond their presumptive legality, MAPs can be procompetitive. The Supreme Court has

recognized that manufacturer-imposed restrictions on the resale of its own products (vertical restraints) can stimulate interbrand competition by promoting product quality, brand image, and dealer service. *See Leegin*, 551 U.S. at 889-90, 895-96. MAPs can advance these goals by protecting brand value and preventing retailers from free riding on others' advertising and customer-experience investments—thereby encouraging all retailers to make such investments. *See Holabird Sports Discounters v. Tennis Tutor, Inc*., 993 F.2d 228, 1993 WL 147470, at *1 n.1 (4th Cir. May 7, 1993). This serves a manufacturer's unilateral economic interest, particularly in premium industries (like archery) where brand differentiation is important. *See id*. at *1-2.

It is against this consistent recognition of MAPs' lawfulness that Plaintiffs must allege evidence—direct or circumstantial—of an unlawful agreement. They fail.

#### ***2. Plaintiffs Do Not Allege Direct Evidence Of Any Unlawful Agreement***

Direct evidence is the "smoking gun"—an explicit admission that Defendants agreed on the terms of a conspiracy. *Llacua*, 930 F.3d at 1177 (direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being asserted"). Plaintiffs allege nothing of the sort. Plaintiffs' theory rests on allegations that Defendants (along with several thousand other ATA members) entered into an unlawful agreement to fix prices for archery products by way of coordinated MAPs. *See* DPPC ¶ 104; IPPC ¶ 59. But the Complaints do not allege direct evidence of any agreement, much less any unlawful or anticompetitive agreement. At most, Plaintiffs allege that some Defendants unilaterally adopted MAP policies, but as noted above, it is well established that MAPs are lawful tools that can enhance, rather than restrict, competition. *Supra* at § IV.A.1.

#### ***3. Plaintiffs Do Not Allege Facts Sufficient To Infer The Alleged Conspiracy***

Plaintiffs' allegations of circumstantial evidence are insufficient to state a Sherman Act

claim. In assessing circumstantial allegations, the "crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553. Thus, "[t]o prevail on a § 1 claim, a plaintiff must include evidence tending to exclude the possibility of independent action." *Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*, 691 F. App'x 515, 519 (10th Cir. 2017). A plaintiff relying on circumstantial evidence must allege facts showing "parallel conduct," together with "plus factors" that support a plausible inference of conspiracy. *Llacua*, 930 F.3d at 1178; *Crownalytics, LLC v. SPINS LLC*, 2023 WL 3071192, at *5 (D. Colo. Apr. 25, 2023) (the "something more" required to survive a Section 1 claim "has been characterized as 'plus factors'"). Here, the Complaints fail to adequately allege either parallel conduct or the requisite plus factors.

a. <u>Plaintiffs Fail To Plead Parallel Conduct</u>

Plaintiffs fail to allege facts indicating Defendants engaged in any parallel conduct with respect to MAP adoption, content, or enforcement beyond conclusory allegations that each Defendant "sold Archery products subject to a MAP," *see* DPPC ¶¶ 47-63; IPPC ¶¶ 6-20—much less "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties,'" *Twombly,* 550 U.S. at 557 n.4. Their antitrust claims should be dismissed for this reason alone. *See, e.g.*, *Hogan v. Pilgrim's Pride Corp.*, No. 16-C-02611-RBJ, 2018 WL 1316979, at *7-8 (D. Colo. Mar. 14, 2018) (dismissing antitrust conspiracy claim for "fail[ure] to plead that the co-conspirators engaged in parallel conduct in the first place").

Plaintiffs' "specific" factual allegations are limited to one distributor's adoption of a MAP in June 2015, DPPC ¶ 117; one manufacturer's announcement of a "new" MAP in 2018, *id.* ¶ 161;

one non-defendant manufacturer's adoption of a MAP in 2014, *id.* ¶ 121; and the concession that MAPs have "existed within the Archery Products industry as early as the 2000s," long before the alleged conspiracy began. *Id.* ¶ 5.[2] Plaintiffs do not allege specific facts regarding the existence or content of any other MAP; the date it was adopted; the products, prices, and advertising to which it applied; whether and how it was ever enforced; or how it compared to any other MAP.

Instead, Plaintiffs cherry-pick snippets from ATA articles, social media posts, and events over several years that aimed to educate members about MAPs. But allegations regarding ATA communications do not sufficiently allege joint action by all Defendants. Whether the ATA promoted MAPs, trainings, or sample policies does not show that any Defendant agreed with its competitors to adopt a MAP—much less that all Defendants adopted or enforced MAPs in close succession or to achieve any anticompetitive end. If anything, the years-long span of alleged ATA statements undercuts any claim of close-in-time, parallel adoption sufficient to infer a conspiracy beginning in 2014. *See, e.g.,* DPPC ¶¶ 16, 134 (July 2017: "MAP: What is it? Why Does it Exist"); ¶ 137 (Oct 2017: "What's MAP: We're educating retailers and manufacturers"); ¶ 158 (March 2019: "Learn about MAP policy enforcement in this [podcast] episode."). Further, the routine activities of a trade association like the ATA do not suggest an illegal conspiracy. *See, e.g., In re Musical Instruments & Equipment Antitrust Litig.,* 798 F.3d 1186, 1196 (9th Cir. 2015) ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement.").

Plaintiffs' conclusory allegations regarding group boycotts likewise fail. Plaintiffs identify

[2] These allegations are consistent with lawful conduct. *See supra* at § IV.A.1.

no boycotted entity, implicated products, violated MAP, or "industry-wide" conduct. At most, they allege that individual MAPs for two manufacturers included penalties for violations, DPPC ¶¶ 160-61, and that one distributor "announced an updated MAP in June 2015." IPPC ¶ 72; *see* DPPC ¶ 117. None of these allegations describe the MAP's terms or scope, whether retailers complied, whether violations were enforced, whether penalties were imposed, or coordination among any Defendants.[3] Nothing can be reliably inferred from unsupported claims of vaguely similar and lawful conduct occurring by a few entities in the archery industry over more than a decade. *See Park Irmat Drug Corp. v. Express Scripts Hld'g Co.*, 911 F.3d 505, 516-517 (8th Cir. 2018) (affirming dismissal of Section 1 claim where allegations "lack[ed] temporal proximity" and were not "parallel conduct"); *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228-229 (3d Cir. 2011) (alleging only somewhat similar behavior "at different time periods" fell "far short of demonstrating parallel behavior"). Absent plausible allegations of parallel conduct, the Complaints should be dismissed.

b. Plaintiffs Fail To Allege Any Actionable "Plus Factors"

Even if Plaintiffs had alleged parallel conduct, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to survive dismissal. *Twombly*, 550 U.S. at 556. Plaintiffs must also plead "plus factors" that "make a conspiracy claim plausible." *Brown v. JBS USA Food Co.*, 2023 WL 6294161, at *10 (D. Colo. Sept. 27, 2023) (Brimmer, J.). Plus factors are "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent

[3] Even if Plaintiffs could plausibly plead *some* agreement among *some* Defendants, their claims still should be dismissed because an agreement among *some* members does not make it industry-wide. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 351 (3d Cir. 2010) (allegations of problematic parallel conduct did not "plausibly imply an industry-wide conspiracy"); DPPC ¶¶ 104, 109-115, 1 (alleging an industry-wide conspiracy); IPPC ¶¶ 43, 89 (same).

with explicitly coordinated action." *Musical Instruments*, 798 F.3d at 1194. "[A] single plausible plus factor allegation that weakly tips in the plaintiffs' favor, without some further factual support, is not enough to open the floodgates to discovery in antitrust cases." *Brown v. JBS USA Food Co.*, 773 F. Supp. 3d 1193, 1222 (D. Colo. 2025) (internal quotation marks omitted). Plaintiffs fail to articulate "plus factors" supporting an inference of conspiracy. Instead, the facts alleged only underscore the *implausibility* of any conspiracy.

*i. ATA Membership Does Not Support A Conspiracy*

Plaintiffs rely on ATA membership for Defendants and thousands of alleged co-conspirators to infer a years-long, industry-wide conspiracy. *See, e.g.*, DPPC ¶¶ 2-3, 9-10, 111; IPPC ¶¶ 3, 59, 63. This allegation requires careful scrutiny as "[n]ot every action by a trade association is concerted action by the association's members." *Llacua*, 930 F.3d at 1178.

Courts repeatedly hold that membership or participation in a trade association does not make a conspiracy more plausible, as such associations are often pro-competitive. *See id*. at 1180; *see also In re Citric Acid Litigation*, 191 F.3d 1090, 1098 (9th Cir. 1999) (noting that trade associations do not inherently create "an inference of conspiracy" but instead "often serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services."). Further, "membership in an association does not render an association's members automatically liable for [alleged] antitrust violations . . . [e]ven participation on the association's board of directors is not enough by itself." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008). Rather, the facts alleged "should tend to show that association members, *in their individual capacities*,

consciously committed themselves to a common scheme designed to achieve an unlawful objective." *Llacua*, 930 F.3d at 1179 (emphasis added). Plaintiffs fall far short of this standard.

Alleged public ATA statements and publications are not attributable to individual ATA members, and Plaintiffs do not plead facts indicating that any Defendant reviewed or approved them. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 885 (9th Cir. 1982) ("[I]n the absence of any indication of agreement or consent to an illegal arrangement, evidence of industry meetings is not sufficient to prove a conspiracy."); *CVB, Inc. v. Corsicana Mattress Co.*, No. 1:20-cv-00144-DBB, 2024 WL 4505044, at *6 (D. Utah Oct. 16, 2024) ("[I]ssuing a press release or hosting a conference panel does not plausibly allege a conscious commitment to illegally restrain trade"). Plaintiffs allege that the ATA educated members about MAP benefits and offered sample language "as a starting point in crafting [their own] customized policies," which "the companies must then enforce themselves," DPPC ¶¶ 114, 116; IPPC ¶¶ 53, 69, facilitated member discussion, and promoted discounted MAP-monitoring software, DPPC ¶¶ 105, 145; IPPC ¶¶ 54, 103. None of this plausibly supports an "agreement" among any, much less all, ATA members to adopt and enforce MAPs, to boycott non-adopters, or cede control over any MAP to the ATA. *See, e.g.*, *Llacua*, 930 F.3d at 1175 (membership in and the opportunity to communicate via trade association not suggestive of conspiracy); *Hogan*, 2018 WL 1316979, at *9 (rejecting Section 1 claim because "membership in trade associations and social interactions with other industry members is insufficient"). Indeed, Plaintiffs do not allege that any Defendant boycotted anyone.

Plaintiffs' allegations that certain Defendants participated in ATA activities are equally deficient. DPPC ¶ 86; IPPC ¶ 47. Participation in trade association activities—like trade shows and online discussion forums—is insufficient by itself to indicate an illegal agreement. As the

Tenth Circuit has recognized, "business associations are 'beneficial to industry and to consumers," and to "avoid deterring the collaboration that yields these benefits, it is necessary to ensure [that] circumstantial evidence . . . must tend to exclude the possibility the parties to the venture were acting independently." *Llacua*, 930 F.3d at 1180. The district court in *In re Nat'l Ass'n of Music. Merchs., Musical Instruments & Equip. Antitrust Litig.,* rejected similar allegations of a trade association "hub and spoke" conspiracy to adopt and enforce MAPs, observing that, like here:

> Plaintiffs have alleged Defendants' representatives attended large trade show meetings or other large meetings attended by a wide variety of people, where MAPs were discussed or advocated as being good for the industry. But unilateral advocacy, particularly in an open and public forum, is not itself an agreement or conspiracy. And independent responses to public advocacy without an agreement, even if consciously parallel to other entities' activity, would simply be permissible parallel conduct. . . . Nor does attendance at trade shows or other large meetings imply an agreement or conspiracy. As the Court's earlier rulings reflect, this is normal business activity, and doesn't imply any kind of illegality.

2012 WL 3637291, at *2 (S.D. Cal. Aug. 20, 2012). The Ninth Circuit reaffirmed that ruling on appeal, explaining that the alleged facts could just as easily suggest rational business behavior rather than a conspiracy. *In re Musical Instruments,* 798 F.3d 1186, 1189 (2015). The same is true here. Like the *Musical Instruments* allegations, Plaintiffs' allegations show only the possibility of a conspiracy, rather than its "plausibility." *Id*. at 1194; *see Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."). For these reasons, Plaintiffs' ATA-related allegations do not plausibly infer a conspiracy.

*ii. MAPs Are Consistent With Lawful, Independent Conduct*

Plaintiffs allege that unilateral MAP adoption—or distributor and retailer compliance—conflicts with each Defendant's self-interest. *See* DPPC ¶ 5. Not so. As the Tenth Circuit has

held, a "conspiracy allegation will fail if there is an independent business justification which explains the alleged conspirators' conduct." *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989); *see Musical Instruments*, 798 F.3d at 1195 (plus factor requires "extreme action against self-interest" that "no reasonable firm" would undertake).

As discussed above, MAPs are common and lawful. *Supra* at § IV.A.1; *see*, *e.g.*, *FTC v. Tempur Sealy Int'l, Inc.*, 768 F. Supp. 3d 787, 803 (S.D. Tex. 2025) (noting MAPs are commonly used by "mattress suppliers"); *Marker Volkl USA, Inc. v. Outdoor Outlet, LLC*, 2011 WL 2173797, at *2 (E.D. Wis. June 2, 2011) (MAPs protect manufacturer's "quality distribution system and superior product image" and discourage "'free riding' on the service and investment of other [product] retailers"); *Contractor Tool Supply, Inc. v. JPW Indus., Inc.*, 2024 WL 4980597, at *1 (M.D. Fl. Dec. 4, 2024) (dismissing antitrust claim challenging MAP adopted to "protect the reputation and value of [manufacturer's] brands"). Moreover, there are any number of long-recognized "independent business justifications" for the adoption of MAPs by manufacturers. *See Leegin*, 551 U.S. at 889. Distributors and retailers also have strong, independent incentives to comply with a manufacturer's MAP. *See*, *e.g.*, *Marker Volkl*, 2011 WL 2173797, at *2-3 (retailer warned, suspended, and ultimately terminated by a manufacturer for repeated violations of unilateral MAP). Plaintiffs allege nothing to demonstrate why the alleged MAPs here constitute "extreme action against self-interest" in light of the ubiquity of MAPs generally.

And Plaintiffs admit that this ubiquity extends to the archery industry, acknowledging that "MAPs already existed within the Archery Products industry in the early-2000s," DPPC ¶ 107—years before the alleged conspiracy. Plaintiffs thus disprove their claim that "no reasonable firm" would adopt MAPs absent an industry-wide conspiracy. Plaintiffs also highlight other benefits of

MAPs.[4] Because MAPs are equally consistent with lawful conduct as with the alleged conspiracy, this "plus factor" does not support an inference of a conspiracy.

iii. *Plaintiffs' Other Alleged Plus Factors Fail*

**Industry Structure.** Plaintiffs contend the archery industry's structure—high barriers to entry and fungible products—makes it susceptible to collusion. DPPC ¶ 181; IPPC ¶ 137. But the Complaints themselves undercut this theory, acknowledging the "market for Archery Products has grown considerably over the past five decades" and was "expected to reach $2.35 billion in 2025 and grow to $3.04 billion by 2030." DPPC ¶ 77; *accord* IPPC ¶¶ 1-2 (the market "is expected to continue to grow rapidly" and conceding "[a]dvances in equipment technology have made archery more accessible and more appealing to a broader audience, adding to the growth in the market"). And "[a]pproximately 6,000 retail outlets in the United States" belies any claim of high barriers to entry. DPPC ¶ 78; IPPC ¶ 35. Regardless, high barriers to entry and fungible products do not suggest collusion; they are "simply indicia that the . . . industry is an oligopoly, which is perfectly legal." *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1317 (11th Cir. 2003).

**Common Motive.** Plaintiffs also allege Defendants have a motive to collude "to expand their profit margins." DPPC ¶ 184; *see also* IPPC ¶ 137. "But common motive does not suggest an agreement." *Musical Instruments*, 798 F.3d at 1194. And wanting to increase profits does not suggest collusion, or else "every company in every industry could be accused of conspiring because they all would have such a motive." *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007); *see also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134-35 (3d

[4] Plaintiffs recognize that MAPs "help manufacturers protect their integrity, maintain their worth, and stabilize their brand." IPPC ¶ 93; *see also* DPPC ¶ 117. MAP enforcement by a retailer can "strengthen[]" a manufacturer's brand in the market. DPPC ¶ 118.

Cir. 1999) ("[P]rofit is always a motivating factor in the conduct of a business.").

**Exchange of Sensitive Information**. At most, Plaintiffs allege that unidentified ATA members participated in industry surveys to compare their businesses with regional competitors. DPPC ¶¶ 190, 191; IPPC ¶¶ 119, 123-24. This falls short of suggesting an unlawful agreement. Exchanging pricing or MAP information is consistent with unilateral, competitive conduct, especially where, as here, Plaintiffs do not allege that such exchange influenced pricing decisions. *See In re Baby Food*, 166 F.3d at 126 ("Gathering competitors' price information can be consistent with independent competitor behavior."); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) ("Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange."); *Brown*, 2023 WL 6294161, at *11 (distinguishing exchange of future data, which supports price fixing, from current data, which does not).

*iv. The Alleged Conspiracy Is Broad And Implausible*

Finally, the alleged conspiracy's breadth negates any inference of a plausible agreement. Plaintiffs posit an industry-wide scheme involving 17 Defendants and more than 2,500 ATA members "span[ning] the overwhelming majority of Archery Product manufacturers, distributors, and retailers," DPPC ¶ 1—all agreeing to adopt and enforce MAPs (and boycott noncompliers) for over a decade. "[C]asting this extremely wide net" while "fail[ing] to link each of the defendants individually to specific acts of anticompetitive conduct in furtherance of the conspiracy" renders "the claimed antitrust conspiracy . . . implausible as alleged." *Alaska Dep't of Revenue, Treasury Div. v. Manku*, 2021 WL 3027170, at *4 (2d Cir. July 19, 2021) (affirming dismissal of conspiracy "involving more than twenty entities"); *see also Okla. Firefighters Pension & Ret. Sys. v. Deutsche*

*Bank Aktiengesellschaft*, 2024 WL 4202680, at *8 (S.D.N.Y. Sept. 13, 2024) (finding implausible "a wide-ranging conspiracy" involving five banking groups over five years).

* * * *

Given the implausible conspiracy allegations, the absence of parallel conduct, and plus factors cutting against them, Plaintiffs cannot state a viable Section 1 or Section 3 claim.

#### *4. The Complaints Do Not State Antitrust Claims Under The Rule Of Reason Because Plaintiffs Fail To Allege A Plausible Relevant Market*

Having failed to allege a per se violation of the Sherman Act, Plaintiffs alternatively invoke the rule of reason. *See* DPPC ¶ 212; IPPC ¶ 180. This theory fares no better. Plaintiffs still must plausibly allege the existence of an agreement—meaning their claims fail under either framework. Moreover, the rule of reason "requires the plaintiff to allege a valid market." *Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 186 (10th Cir. 2025). Plaintiffs' proposed "Archery Products" market lumps together: (1) bows; (2) arrows; (3) arrowheads; (4) targets; and (5) multiple accessories such as cases, quivers, sights, scopes, and stabilizers. DPPC ¶ 200; IPPC ¶ 30. This hodgepodge of archery-related products consists largely of *complements*, not functional substitutes. Attempting to shoehorn these products into a single "relevant market" fails the most basic market definition standards. Similarly, Plaintiffs' allegation of a national market fails to meet the requirements for proper pleading of a geographic market.

##### a. The Alleged "Archery Products" Market Violates Principles Of Reasonable Interchangeability

The Tenth Circuit has long held that relevant markets must be defined by reasonable interchangeability to meaningfully assess competitive effects, and claims failing to do so should be dismissed. *See, e.g.*, *Ass'n of Surgical Assistants*, 127 F.4th at 188 (10th Cir. 2025); *see also*

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017). Plaintiffs make no attempt to justify their alleged relevant market based on reasonable interchangeability. Instead, they allege a "market" tailor-made for their overbroad allegations of an industry-wide conspiracy spanning *all* archery-related products and *all* levels of the distribution chain. Their only justification is that viewing Archery Products "as a whole" is "appropriate" and "efficient" because there is no "analytical difference" between the "competitive effects" as to the various products they lump together. DPPC ¶ 201.[5] But this claim—unsupported by any *factual* averments—simply adopts its own conclusion as a premise. *See Adidas Am., Inc. v. NCAA*, 64 F. Supp. 2d 1097 (D. Kan. 1999) ("[A]n antitrust plaintiff may not define a market so as to cover only the practice complained of, [as] this would be circular or at least result-oriented reasoning.").

b. Plaintiffs Do Not Sufficiently Allege A "Cluster Market"

Plaintiffs cannot save their proposed market definition by casting it as a "cluster market." "A cluster market exists only when the 'cluster' is *itself* an object of consumer demand. In other words, the cluster approach is only appropriate where 'the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately.'" *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1284 (10th Cir. 2004) (quoting *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1221 (10th Cir. 1986)). Plaintiffs allege nothing to support a cluster market of "Archery Products." Indeed, their proposed market would "[g]roup[] complementary goods into the same market," which is "economic nonsense." Areeda & Hovenkamp, § 565a (explaining that artificially increasing the

---

[5] IPPs' allegations are even more cursory, stating only that "MAPs . . . applied to most items and price points of most Archery Products." IPPC ¶ 140.

price of one complementary good will *lower*, not raise, the price of other complements).

c. Plaintiffs' Complaints Do Not Properly Allege A National Market

Retail competition is inherently local, as retail stores serve people who need to travel to them, typically over relatively short distances. *Tempur Sealy*, 768 F. Supp. 3d at 829 (rejecting allegation that geographic market encompassed the United States and highlighting that "both experts agreed that retail competition is local"); *FTC v. Kroger Co.*, 2024 WL 5053016, at *12 (D. Or. Dec. 10, 2024) ("Retail markets . . . are often small, especially when customers are motivated by convenience."). The Complaints are silent about the competitive environment in which retailers operate, much less offer any reason to suggest that retailers compete in a national market.

### B. Plaintiffs Impermissibly Rely On Group Pleading

The allegations are also deficient as to any claims against each individual Defendant. Plaintiffs impermissibly plead nearly all allegations against the 17 Defendants as an undifferentiated collective, rather than alleging specific facts as to each Defendant's conduct. *See, e.g.*, IPPC ¶ 59 ("Defendants agreed, combined, or conspired . . . ."); DPPC ¶ 104 ("[T]he ATA and Defendants agreed . . . ."). Plaintiffs' collective approach violates Federal Rules 8(a)(2) and 12(b)(6), which require allegations showing plausible entitlement to relief against each defendant. *See Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 555, 557. Where, as here, the allegations against any specific defendant are conclusory or speculative, the claims against that defendant must be dismissed. *Twombly*, 550 U.S. at 555.

#### *1. Plaintiffs Fail To Allege Sufficient Facts As To Each Defendant*

Group pleading is not sufficient to state a claim. *See, e.g.*, *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008); *Snyder v. ACORD Corp.*, 2016 WL 192270, at *3 (D. Colo. Jan. 15,

2016) (bringing "claims against 'Defendants' as an undifferentiated group" is "group pleading [that] violates Rule 8"), *aff'd*, 684 F. App'x 710 (10th Cir. 2017). Plaintiffs must do more than make "repetitive generic reference[s] to 'Defendants'"—they must "connect [each] individual defendant to an actual agreement in an antitrust conspiracy." *CVB*, 2024 WL 4505044, at *4. Plaintiffs must answer "basic questions" about each Defendant's participation: "who, did what, to whom (or with whom), where, and when?" *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008). Courts have warned plaintiffs that "if a complaint uses . . . the collective term 'Defendants'" or lists defendants with "no distinction as to what acts are attributable to whom," the court "will not speculate as to what acts a particular defendant is alleged to have committed." *New Mexico ex rel. Foy v. Vanderbilt Cap. Advisors, LLC*, 2009 WL 3672921, at *4 (D.N.M. Apr. 13, 2009); *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011) ("Court[s] properly look[] for more than mere repetitive generic reference to 'Defendants' tacked on to a conclusory verb form to connect an individual defendant to an . . . antitrust conspiracy" because "collective language is too convenient, too undisciplined, and too unfocused in light of exposures to litigation expense and disruption . . . that are so great in antitrust . . . cases.").

Plaintiffs cannot establish conspiracy participation by repeatedly referring to "Defendants" as a monolithic bloc. That type of pleading obscures which Defendant committed which act. *See Bristow*, 691 F. App'x at 519 (in complex multi-defendant cases, "it is particularly important to make clear exactly who is alleged to have done what to whom"). Nor can Plaintiffs group Defendants by industry roles and make allegations about each group; a claim must be validly pleaded against each individual Defendant. *See* Appendix A (Defendant-specific arguments).

**Manufacturers.** Plaintiffs allege that the manufacturer Defendants "sold Archery

Products subject to a MAP." DPPC ¶¶ 47-55, 76; IPPC ¶¶ 6-13, 30. But Plaintiffs do not indicate (i) which "Archery Products" each manufacturer Defendant makes, (ii) the substance of any MAP for any product or manufacturer, (iii) whether each manufacturer adopted a MAP during the relevant period, or (iv) any facts suggesting each manufacturer adopted MAPs in temporal proximity to others or sought collective enforcement of those MAPs. *See* DPPC ¶¶ 47-55; IPPC ¶¶ 6-13; *see also* DPPC ¶ 24 (acknowledging manufacturer MAPs differ). Plaintiffs' failure to allege any manufacturer-specific facts negates any inference of parallel conduct (much less express collusion). *See Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *7-8 (D. Colo. Mar. 14, 2018) (dismissing antitrust claim for "fail[ure] to plead that the co-conspirators engaged in parallel conduct").

**Distributors.** The two distributor Defendants are alleged to be wholesalers who buy certain Archery Products from manufacturers and resell them to retailers. DPPC ¶¶ 62-63; IPPC ¶¶ 18-19. Plaintiffs do not allege that the distributor Defendants sold any Archery Product to any retailer subject to a MAP. DPPC ¶ 79; IPPC ¶ 33. Given this omission, Plaintiffs have not alleged viable claims against the distributor Defendants.

**Retailers.** Despite referencing "retailers" over 200 times, the Complaints lack allegations sufficient to state a claim against any *specific* retailer Defendant. For example, Plaintiffs plead no facts about (i) which Archery Products each retailer sold, (ii) whether any retailer sold any Archery Product subject to a MAP, or (iii) the terms of any MAP with which any retailer decided to comply. Nor do Plaintiffs allege any facts suggesting it was economically irrational for retailers to comply with MAPs. *See* DPPC ¶¶ 78, 80; IPPC ¶¶ 35-36. Plaintiffs' generic allegations against "retailers" do not satisfy their burden to plead facts against *each* Defendant. *See Bristow Endeavor*

*Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*, 2016 WL 3199520, at *1, *3 (N.D. Okla. June 8, 2016) (dismissing claims for lack of specific allegations that defendant "played any role in the alleged anticompetitive conspiracy").

### *2. Plaintiffs Cannot Rely On Trade Association Participation*

While the allegations are deficient as to all Defendants, eight in particular—Bear Archery, Easton, Hamskea, Hoyt, Mathews, Jay's, Scheels, and Lancaster—warrant dismissal because Plaintiffs assert only "bare and unspecific" allegations of ATA participation. *Huntsman v. Liberty Mutual. Auto & Home Serv.*, 2025 WL 2405953, at *6, 9-14 (D. Colo. Aug. 19, 2025) (dismissing "nominal" defendants because allegations do not "comply with the pleading requirements of Rule 8"); *see* DPPC ¶¶ 53, 86 & IPPC ¶¶ 10, 47 (Bear Archery); DPPC ¶¶ 55, 86 & IPPC ¶¶ 13, 47 (Easton); DPPC ¶ 47 (Hamskea); DPPC ¶¶ 49, 86, 134 & IPPC ¶¶ 6, 47, 91 (Hoyt); DPPC ¶¶ 51, 86 & IPPC ¶¶ 8, 47 (Mathews); DPPC ¶¶ 59, 86-87, 90, 93, 131 & IPPC ¶¶ 17, 47, 51, 89 (Jay's); DPPC ¶¶ 60, 86, 90 & IPPC ¶¶ 20, 47, 51 (Scheels); DPPC ¶¶ 63, 86, 90 & IPPC ¶¶ 19, 47, 51 (Lancaster). As discussed above, *see supra* at § IV.A.3(b)(i), trade association membership, including board participation, cannot state a claim. *See, e.g.*, *Kissing Camels Surgery Center, LLC v. Centura Health Corp.*, 2014 WL 560462, at *6-8 (D. Colo. Feb. 13, 2014) (dismissing claims where plaintiffs alleged only lawful conduct, including trade association meeting attendance).

Plaintiffs do not provide these defendants fair notice of any claim. *See Twombly*, 550 U.S. at 555. Plaintiffs allege only a speculative right to relief based on conclusory conspiracy allegations and thus fail to comply with even the most basic pleading requirements. *See Bristow*, 2016 WL 3199520, at *1, *3; *Alaska Dep't of Revenue*, 2021 WL 3027170, at *4 (affirming dismissal where complaint "fail[ed] to link each of the defendants individually to specific acts of

anticompetitive conduct in furtherance of the conspiracy"). Plaintiffs' claims against these Defendants should be dismissed for this additional reason.

### C. Plaintiffs' Claims Are Largely Time-Barred

All Plaintiffs assert federal antitrust claims, and IPPs assert state antitrust and consumer protection claims. Plaintiffs' federal antitrust claims are governed by a four-year limitations period. 15 U.S.C. § 15b; *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1247 (10th Cir. 2016). IPPs' state antitrust claims are governed by three, four, or six-year limitations periods. *See* Appendix B; *Walker v. Armco Steel Corp.*, 446 U.S. 740, 745-46 (1980) (state limitations periods govern state claims in federal court); *Burnham v. Humphrey Hospitality Reit Trust, Inc.*, 403 F.3d 709, 712 (10th Cir. 2005). IPPs' consumer protection claims are governed by statute of limitations periods ranging from one to six years. *See* Appendix B. Regardless of the limitations period, Plaintiffs' claims are largely time-barred.

#### *1. Federal Claims For Purchases Before May 30, 2021 Are Time-Barred*

The limitations period for federal antitrust claims begins to run when "a defendant commits an act that injures a plaintiff's business"—i.e., when "a plaintiff feels the adverse impact of an antitrust conspiracy." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)); *see also Auraria Student Hous.*, 843 F.3d at 1247. Plaintiffs allege that they paid inflated prices for Archery Products. DPPC ¶ 214; IPPC ¶ 182. So, their claims accrued on each purchase date and claims based on purchases before May 30, 2021 are time-barred. *See* 15 U.S.C. § 15b; *Santarlas*, 2:25-cv-00436-DAK (D. Utah) (filed May 30, 2025).

Although the Complaints invoke the fraudulent concealment and continuing violation doctrines, *see* DPPC ¶¶ 168-70, 204-08; IPPC ¶¶ 150-54, Plaintiffs have not met their "burden of

establishing a factual basis for tolling the statute [of limitations]." *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980).

**Continuing violation doctrine.** The continuing violation doctrine is not a tolling rule; rather, "each time a plaintiff is injured by an act of the defendants[,] a cause of action accrues to him to recover the damages *caused by that act* and, *as to those damages*, the statute of limitations *runs from the commission of the act*." *Kaw Valley Elec. Coop. Co., Inc. v. Kan. Elec. Power Coop., Inc.*, 872 F.2d 931, 933 (10th Cir. 1989) (cleaned up, emphasis added). "But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). That is the situation here. Plaintiffs' purchases before May 30, 2021 correspond to "old overt acts outside the limitations period." *Id.* Plaintiffs "cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Id.* at 190. Claims arising from those earlier purchases are therefore time-barred. *See id.* at 189 (limitations period ran from purchase date in alleged "price-fixing conspiracy that [brought] about a series of unlawfully high priced sales over a period of years").

**Fraudulent concealment.** Plaintiffs likewise cannot use alleged fraudulent concealment to toll the statute of limitations for their federal claims. *See* DPPC ¶ 204; IPPC ¶ 154. "Because a claim of fraudulent concealment is based on fraud, the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies." *See Brown*, 773 F. Supp. 3d at 1231. To invoke fraudulent concealment, Plaintiffs must show: "(1) the use of fraudulent means by the party who raises the ban of the statute [of limitations]; (2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of due diligence could

not have known that he might have a cause of action." *Id.* at 1231 (quoting *In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d 895, 932 (D.N.M. 2023)). Further, "when a limitations period is tolled because of fraudulent concealment of facts, the tolling ceases when those facts are, or should have been, discovered by the plaintiff." *Credit Suisse Secs. (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012).

Plaintiffs have not pleaded successful concealment because the facts they rely on to infer an unlawful agreement were publicly available years before Plaintiffs filed suit:

- **On Defendants' websites**: DPPC ¶¶ 18 (2018 website), 21 (2019 website), 98 (2019 website), 120-25 (2016 website), 134-40 (2017 website), 141 (2018 website), 145-47 (2017 website), 148 (2018 website) & 159 (2019 website); IPPC ¶¶ 65 (2014 website), 68 (2015 website), 78-86 (2016 website), 90 (2017 website), 93-97 (2017 website), 102 (2019 website), 108-11 (2019 website) & 114 (2020 website).
- **In Twitter posts**: DPPC ¶¶ 12 (2015 tweet), 14 (2016 tweet), 20 (2019 tweet), 115 (2015 tweet), 137 (2017 tweet), 139 (2017 tweet), 149-51 (2019 tweet), 156 (2019 tweet) & 158 (2019 tweet); IPPC ¶¶ 68 (2015 tweet) & 108-09 (2019 tweet).
- **In Facebook posts**: DPPC ¶¶ 16 (2017 post), 20 (2019 post), 134 (2017 post), 137 (2017 post), 141-42 (2018 post), 149-51 (2019 post), 154 (2019 post) & 158 (2019 post); IPPC ¶¶ 108-09 (2019 post).
- **During podcasts**: DPPC ¶¶ 149 (2019 podcasts) & 153-58 (2019 podcasts); IPPC ¶¶ 107 (2019 podcasts) & 112 (2019 podcast).
- **In industry magazines, newsletters, press releases, or online forum posts**: DPPC ¶¶ 119 (2015 post), 162 (2020 magazine), 164 (2019 magazine), 165-66 (2020 magazines), 176 (2016 post) & 177 (2017 post); IPPC ¶¶ 69-70 (2015 newsletter), 73 (2015 press release), 76 (2016 post), 98 (2017 press release) & 115-17 (2020 magazines).

Indeed, Plaintiffs allege public disclosure of these facts no later than 2019, citing "numerous posts, articles, and podcasts" in discussing MAP enforcement and "boycotting of those who did not follow MAPs." DPPC ¶ 149; *accord* IPPC ¶ 107. Because these are the same facts underlying Plaintiffs' federal claims, any equitable tolling ended no later than 2019, over four years before Plaintiffs filed suit. *See Credit Suisse Secs.*, 566 U.S. at 227.

Plaintiffs also fail to plausibly allege the diligence required for fraudulent concealment. *See Dummar v. Lummis*, 543 F.3d 614, 622 (10th Cir. 2008); *Brown*, 773 F. Supp. 3d at 1231. Plaintiffs make no "allegation regarding how and when [they] learned of the alleged misconduct." *See Dummar*, 543 F.3d at 622. Nor do Plaintiffs allege they discovered new information supporting their claims within the four-year limitations period. *See id.* ("If the allegations in the paragraph are based on information acquired only in recent years, the Complaint needed to assert that."). Plaintiffs do not explain why they could not have discovered the operative facts before May 30, 2021—especially given the pre-2021 public disclosures discussed above.

### 2. *IPPs' State Law Claims Are Largely Time-Barred*

IPPs' state claims are largely time-barred for the same reasons as Plaintiffs' federal claims. Although IPPs' state claims are governed by state statutes of limitations and tolling rules, IPPs must plausibly allege grounds to toll the applicable limitations periods as a matter of federal procedural law. *See Aldrich*, 627 F.2d at 1041 n.4; *Dummar*, 543 F.3d at 619. IPPs have not done so, and thus their untimely state claims should also be dismissed.

#### a. <u>The Continuing Violation Doctrine Cannot Save State Law Claims</u>

**Not all states recognize the doctrine.** IPPs assert claims under at least ten states that do not recognize the continuing violation doctrine outside employment discrimination.[6] IPPs' claims under these states' laws are thus time-barred. IPPs cannot connect (or relate back) any Archery Product purchase within the limitations period to Defendants' alleged acts outside it. *See In re Pre-Filled Propane Tank Antitrust Litig.*, 2019 WL 4796528, at *4 (W.D. Mo. Aug. 21, 2019).

[6] Arkansas, Colorado, the District of Columbia, Kansas, Massachusetts, Mississippi, Oregon, Tennessee, Vermont, and Wisconsin. *See* Appendix C.

**Most states follow the federal rule.** For those states that recognize the continuing violation doctrine, virtually all align with the federal rule and permit recovery only for overt acts causing injury within the limitations period. *See, e.g.*, *Garg v. Macomb Cty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 658 (Mich. 2005) (rejecting continuing violation rule that would have allowed recovery of damages incurred outside limitations period); *McKinnon v. Honeywell Int'l, Inc.*, 977 A.2d 420, 425 (Me. 2009) (same).[7] Hawaii and West Virginia are the only potential exceptions, but the better reading of each statute is that they too follow the federal rule.[8]

**IPPs' state claims are untimely.** IPPs fail to plausibly allege that the continuing violation doctrine saves *any* of their state claims. IPPs allege tolling but provide no specific details about continuing conduct. *See* IPPC ¶¶ 150-54. This failure is fatal to their state law claims.

IPPs' allegation that "each purchase of an Archery Product subject to MAP pricing is a new overt act causing injury to Plaintiffs and the Classes," IPPC ¶ 153, also conflicts with the majority rule that only overt acts causing injury within the limitations period are timely. *See Klehr*, 521 U.S. at 190; Appendix B. The Court should dismiss all state claims based on purchases outside the applicable limitations periods because IPPs cannot recover "for injuries caused by earlier predicate acts that took place outside the limitations period." *Klehr*, 521 U.S. at 190.[9]

---

[7] Appendix C refers to the federal rule as the "Separate Accrual Rule," while the minority rule is the "Entirety Rule." *See Connecticut v. Sandoz, Inc.*, 2025 WL 3043397, at *15 (D. Conn. Oct. 31, 2025) (discussing both rules).

[8] *See* Appendix C. At least one federal court has found that neither state allows recovery "going all the way back to the initial transgression." *In re Processed Egg Prods. Antitrust Litig.*, 931 F. Supp. 2d 654, 663-64 (E.D. Pa. 2013) (cleaned up). And Alaska—interpreting identical language—bars recovery of pre-limitations-period damages. *See Alakayak v. B.C. Packers, Ltd.*, 48 P.3d 432, 460-62 (Alaska 2002).

[9] Dismissal is especially appropriate for states with federal harmonization provisions because applying the federal continuing violation rule furthers harmonization. *See* Appendix C.

b. Neither Fraudulent Concealment Nor The Discovery Rule Can Save IPPs' State Law Claims

The public disclosures discussed above gave IPPs actual or constructive knowledge of the operative facts by late 2014—well outside even a six-year limitations period.[10] In every state applying fraudulent concealment or the discovery rule, a claim accrues (or tolling ceases) when the plaintiff discovered or should have discovered the underlying facts. *See* Appendix C.

IPPs (like DPPs) do not allege they uncovered any new information during the limitations periods suggesting their claims were not reasonably discoverable before those periods expired. To the contrary, IPPs admit the operative facts were publicly disclosed by late 2014. *See, e.g.*, IPPC ¶¶ 65 (Dec. 31, 2014 blog post "highlight[ing] that industry-wide adoption and enforcement [of MAPs] were necessary for profitability . . . and . . . urg[ing] other manufacturers and retailers to join forces and agree to the policies") & 68 (Feb. 9, 2015 Twitter post linking to article entitled "ATA Helps Members Develop MAP Policies"). The facts underlying IPPs' claims were thus neither concealed nor undiscoverable when IPPs purchased Archery Products after 2014.

IPPs incorrectly claim their consumer status obviated any duty to investigate their claims. *See* IPPC ¶¶ 150-51. But DPPs allege that consumers have considered Archery Products' prices inflated since at least 2017. *See* DPPC ¶ 178. Given this allegation and the public disclosures dating to late 2014, IPPs were on inquiry notice when they made their purchases. Their failure to plead diligence bars reliance on fraudulent concealment or the discovery rule to toll limitations. *See* IPPC ¶¶ 150-54; *Dummar*, 543 F.3d at 622-23 (affirming statute of limitations dismissal due to plaintiff's failure to plead diligence); Appendix C.

---

[10] *See, e.g.*, Illinois (*Austin v. House of Vision, Inc.*, 243 N.E.2d 297, 299 (Ill. App. Ct. 1968)); Michigan (*McLain v. Roman Catholic Diocese of Lansing*, 22 N.W.3d 284, 291 (Mich. 2024)).

c. Statutes Of Repose Also Bar IPPs' Consumer Protection Claims

Finally, two states have statutes of repose for consumer protection claims. *See* TENN. CODE § 47-18-110 (five-year statute of repose); ALA. CODE § 8-19-14 (four-year statute of repose). If IPPs' claims are subject to a statute of repose, they are time-barred regardless of whether any tolling doctrine applies. *See, e.g.*, *Pinigis v. Regions Bank*, 977 So.2d 446, 449 (Ala. 2007).

**D. IPPs Lack Article III Standing To Bring Most Of Their State Law Claims**

Article III standing is an "irreducible constitutional minimum." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must "clearly allege facts demonstrating" standing at the pleading stage, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), "for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *Loc. 514 Transp. Workers Union of Am. v. Keating*, 358 F.3d 743, 750 (10th Cir. 2004) (standing "must be analyzed with reference to the particular" statutory "claim[s] asserted by plaintiffs").

In a class action, named plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (citations omitted). Accordingly, "a named plaintiff must possess standing as to *each individual claim* asserted in a complaint" to maintain a putative class action. *Donelson v. United States*, 730 F. App'x 597, 601-02 (10th Cir. 2018) (citations omitted) (emphasis added).

IPPs—a Wisconsin resident and a Texas resident who allegedly purchased Archery Products in only Minnesota, Texas, and Wisconsin, IPPC ¶¶ 4-5—seek to represent "[a]ll persons and entities residing in" 33 states or the District of Columbia. IPPC ¶ 156. Where a "complaint alleges no connection between [a named plaintiff's] transactions and any injuries to her allegedly

arising from [Defendants'] violation of the laws of . . . states where she is not alleged to be a resident," the class "claims for violation of the laws of [those] states should be dismissed for lack of standing." *Thomas v. Metro. Life Ins. Co.*, 540 F. Supp. 2d 1212, 1226 (W.D. Okla. 2008).

This rule comports with the Tenth Circuit's recent Article III jurisprudence. In *Utah Physicians for a Healthy Environment v. Diesel Power Gear, LLC*, the Tenth Circuit analyzed standing of a Utah plaintiff-association based on where vehicles with emission defeat devices were sold. 21 F.4th 1229, 1246-48 (10th Cir. 2021). Although the plaintiff had standing for *some* claims, it did not for "claims based on vehicles never driven in Utah or defeat devices sold to persons outside Utah." *Id.* at 1248. The same analysis applies here—Archery Product purchases in one state cannot confer standing to redress injuries from purchases in other states. *See, e.g.*, *Smith v. Pizza Hut, Inc.*, 2011 WL 2791331, at *9-10 (D. Colo. July 14, 2011) ("[N]umerous cases" in the Tenth Circuit have held "that named plaintiffs lack standing to bring claims on behalf of a class under the laws of states where the named plaintiffs have never lived or resided."); *Valverde v. Xclusive Staffing, Inc.*, 2017 WL 3866769, at *7 (D. Colo. Sept. 5, 2017) (dismissing putative class claims "based on laws of states other than Colorado . . . for lack of standing").

This Court should hold likewise, even though it recently followed out-of-circuit precedent finding that this issue "implicates a choice-of-law analysis that is best reserved for the class certification stage." *Butler v. Specialized Loan Servicing LLC*, 2025 WL 2613745, at *5 (D. Colo. Sept. 10, 2025) (Brimmer, J.). The Supreme Court and Tenth Circuit authorities discussed here, which were not presented to the Court in *Butler*, require strict claim-by-claim application of Article III standing requirements at the Rule 12 stage. "Prior to class certification, the named plaintiffs' failure to maintain a live case or controversy is fatal to the case as a whole—that unnamed plaintiffs

might have a case or controversy is irrelevant." *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1159 (10th Cir. 2011); *see In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1310-11 (D. Kan. 2018) (citing *Thomas* as "binding Circuit precedent" to "dismiss[] antitrust state law claims for which the Class Complaint includes no named plaintiff from that state"). Unnamed class members' alleged injuries in 31 jurisdictions are just as "irrelevant" to IPPs' state claims here, and those claims should be dismissed.

### E. IPPs' State Law Claims Should Be Dismissed

IPPs' state law claims—spanning 25 state antitrust and 29 state consumer protection laws—should fail with their Sherman Act claims because they rest on the same alleged conduct as those claims. *See, e.g.*, IPPC ¶¶ 190, 195; *see also Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1219 n.1 (10th Cir. 2009) (Gorsuch, C.J.) (Tenth Circuit analyzes federal and state antitrust claims collectively); *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 54 n.7 (9th Cir. 2022); *In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193, at *24 (S.D.N.Y. June 25, 2025) ("Because the . . . state law claims are based upon the same allegations of price-fixing conspiracy as [p]laintiffs' Sherman Act claims, they must be dismissed as well."). In addition, many of IPPs' state law claims fail because they cannot satisfy state-specific requirements. These defects, detailed in Appendix D, fall into the following categories:

**Texas claims subject to *Illinois Brick*.** IPPs' Texas antitrust and consumer protection claims run headlong into the "*Illinois Brick* wall."[11] The Texas Supreme Court has long held that

[11] "Suffice it to say that the *Illinois Brick* wall still stands." *In re Plywood Antitrust Litig.*, 655 F.2d 627, 643 (5th Cir. 1981) (affirming dismissal of indirect purchaser Sherman Act claims under the Supreme Court's *Illinois Brick* decision).

indirect purchasers cannot recover under either theory. *Abbott Labs., Inc. v. Segura*, 907 S.W.2d 503, 506 (Tex. 1995). These claims should be dismissed.

**In-state residence, purchase, or other substantial connection required.** The antitrust laws of Mississippi, Oregon, and Utah, and the consumer protection laws of Illinois and North Carolina require in-state residency, in-state purchases, or other state-specific connections. IPPs allege only "indirect purchases of Archery Products . . . by Class Members or [state] residents," not by IPPs themselves and fail to specifically allege purchases in or connections to these states warranting dismissal. *See* IPPC ¶ 190; *see also* Appendix D at 15-16.

**Substantive prohibitions on class actions.** IPPs also bring putative class claims under six state statutes that prohibit class actions: Illinois's antitrust statute and the consumer protection statutes of Alabama, Montana, South Carolina, Tennessee, and Utah. These substantive prohibitions displace Rule 23 and require dismissal. *See* Appendix D at 16-18; *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 436 (2010) (Stevens, J., concurring in part) (holding that state laws restricting class actions conflict with Rule 23 but still apply in federal court when they "function as part of the State's definition of substantive rights and remedies").[12] These class action prohibitions are intertwined with the specific state statutes governing plaintiffs' rights to relief, and thus are substantive restrictions. As such, applying Rule 23 instead would unlawfully "abridge, enlarge, or modify" substantive rights. *See James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217 (10th Cir. 2011); *Friedman v. Dollar Thrifty Auto. Grp., Inc.*, 2015 WL 8479746, at *4-5 (D. Colo. Dec. 10, 2015) (recognizing "Rule 23 does not displace

[12] The Tenth Circuit has adopted Justice Stevens's *Shady Grove* concurrence as the applicable standard in assessing whether the state restriction trumps Rule 23. *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217-18 (10th Cir. 2011).

specific restrictions on class actions contained in . . . state consumer-protection laws" or where "the statutory cause of action itself contains a specific restriction on class actions").

**Alleged conduct outside statutory scope.** The Hawaii Unfair Practices Act and Wisconsin's unfair competition statute do not prohibit the conduct IPPs allege. HUPA prohibits price discrimination, certain below-cost sales, and discriminatory rebates, which are not alleged here. *See* Haw. Rev. Stat. § 481-1 through -7. Wisconsin's statute allows suit only for violations of state agency orders, which IPPs do not (and cannot) allege. *See* Wis. Stat. § 100.20(5).

**Statutes requiring deceptive or misleading conduct.** IPPs' consumer protection claims under Colorado, Idaho, Kansas, Maine, Minnesota,[13] New York, and West Virginia law should be dismissed because those statutes require plausible allegations of deceptive or misleading conduct. IPPs' cursory allegations that consumers were "unaware of MAP strategies" and the ATA's existence, and that "Defendants did not allow consumers access to any insider data, insight, lessons, or other key information" on MAPs, *see* IPPC ¶¶ 150-154, do not meet these statutory requirements. IPPs do not allege any conduct that could plausibly be considered "deceptive," see Appendix D at 19-20, and these claims should be dismissed.

## V. CONCLUSION

The Court should dismiss the Complaints with prejudice. Amendment would be futile. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006). Plaintiffs have known of their pleading defects since mid-July 2025. Having had ample time to cure their deficiencies and failing to do so, Plaintiffs should not be given another opportunity to replead.

[13] Minnesota's consumer protection law was amended effective July 1, 2023, before which IPPs' allegations failed to state a claim; claims under this statute should thus be limited to conduct on or after July 1, 2023, to the extent any exist.

Dated: March 20, 2026

Respectfully submitted,

*/s/ Kathryn A. Reilly*
Kathryn A. Reilly
**Wheeler Trigg O'Donnell LLP**
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Phone: 303.244.1800
reilly@wtotrial.com

Brendan McShane
**Latham & Watkins LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Phone: (415) 391-0600
Brendan.McShane@lw.com

*Counsel for BPS Direct, LLC and Cabela's LLC*

*/s/ Wendy Arends*
Wendy Arends
**Husch Blackwell LLP**
33 East Main Street, Suite 300
Madison, WI 53703
Phone: (608) 258-7382
Fax: (608) 258-7138
wendy.arends@huschblackwell.com

A. James Spung
**Husch Blackwell LLP**
1801 Wewatta St., Suite 1000
Denver, CO 80202
Phone: (303) 749-7200
James.Spung@huschblackwell.com

*Counsel for Bowtech, LLC*

*/s/ Erik T. Koons*
Erik T. Koons
**Baker Botts L.L.P.**
700 K Street, N.W.
Washington, D.C. 20001
Phone: (202) 639-7700
erik.koons@bakerbotts.com

*Counsel for Mathews Archery, Inc.*

*/s/ Bentley J. Tolk*
Bentley J. Tolk
**Parr Brown Gee & Loveless, P.C.**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Phone: (801) 532-7840
btolk@parrbrown.com

*Counsel for Archery Trade Association, Inc.*

*/s/ Jeremy J. Stewart*
Jeremy J. Stewart
**Snell & Wilmer LLP**
15 West South Temple, Suite 1200
Salt Lake City, UT 84101
Phone: (801) 257-1865
jjstewart@swlaw.com

*Counsel for Jay's Outdoors LLC d/b/a Jay's Sporting Goods*

*/s/ Eileen Monaghan Ficaro*
Eileen Monaghan Ficaro
**Kaufman Dolowich LLP**
One Liberty Place
1650 Market Street, Suite 4800
Philadelphia, PA 19103
Phone: (267) 841-5908
eficaro@kaufmandolowich.com

*Counsel for Kinsey's Archery Products, Inc. d/b/a Kinsey's Outdoors*

*/s/ William M. Katz, Jr.*
William M. Katz, Jr.
**Greenberg Traurig, LLP**
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
Phone: (214) 665-3600
Bill.Katz@gtlaw.com

*Counsel for Lancaster Archery Supply, Inc.*

*/s/ Allison K. Kostecka*
Allison K. Kostecka
**Gibson Dunn & Crutcher, LLP**
1900 Lawrence Street, Suite 3000
Denver, CO 80202-2211
Phone: (303) 298-5700
akostecka@gibsondunn.com

*Counsel for Scheels All Sports, Inc. d/b/a Scheels*

*/s/ William F. Jones*
William F. Jones
**Lathrop GPM LLP**
675 15th Street, Suite 2650
Denver, Colorado 80202
Phone: (720) 931-3200
billy.jones@lathropgpm.com

*Counsel for Tomorrow's Resources Unlimited, Inc. d/b/a T.R.U. Ball/AXCEL Archery*

*/s/ John J. Michels Jr.*
John J. Michels Jr.
**O'Hagan Meyer PLLC**
1331 17th Street, Suite 350
Denver, CO 80202
Phone: (303) 652-5871
jmichels@ohaganmeyer.com

*Counsel for Hunter's MFG. Co., Inc. d/b/a Tenpoint Crossbow Technologies*

*/s/ Michael A. Roberts*
Michael A. Roberts
**Bricker Graydon Wyatt, LLP**
312 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: (513) 621-6464
mroberts@bricker.com

*Counsel for Bear Archery, Inc.*

*/s/ Elizabeth M. Froehlke*
Elizabeth M. Froehlke
**Berg Hill Greenleaf Ruscitti LLP**
1712 Pearl St., Boulder, CO 80302
Phone: (303) 402-1600
emf@bhgrlaw.com

*Counsel for Hamskea Archery Solutions, LLC*

*/s/ Stephen Weingold*
Stephen Weingold
**Dorsey & Whitney LLP**
1400 Wewatta Street, Suite 400
Denver, CO 80202
Phone: (303) 629-3400
weingold.stephen@dorsey.com

*Counsel for Hoyt Archery, Inc. and Easton Technical Products, Inc. d/b/a Easton Archery*

*/s/ Robert J. Zavaglia*
Robert J. Zavaglia
**Freeman Mathis & Gary LLP**
6400 S. Fiddler's Green, Suite 1900
Greenwood Village, CO 80111
Phone: (303) 292-2700
robert.zavaglia@fmglaw.com

*Counsel for Precision Shooting Equipment, LLC*

## CERTIFICATE OF CONFERENCE

Pursuant to D.C.Colo.LCivR 7.1(a), counsel for Defendants conferred with counsel for Plaintiffs regarding the relief requested in this motion. Plaintiffs oppose the relief requested. Specifically, Defendants' Pre-Conference Statement of the Case, filed on November 13, 2025 (ECF 81), along with motion practice prior to transfer (*Santarlas v. Hoyt Archery, Inc. et al.*, D. Colo. No. 1:25-cv-03620, ECF 31), identified several legal and factual issues addressed in this motion to dismiss. Plaintiffs filed amended and consolidated complaints that did not correct these issues. In December and January, by email and telephone, counsel discussed these and other potential grounds for motions to dismiss in the context of reaching agreement about the schedule and page limits for motions to dismiss. Based on these conferrals, the issues raised in this motion are not correctable by amendment.

*s/ Kathryn A. Reilly*

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on March 20, 2026, I electronically filed the foregoing DEFENDANTS' JOINT MOTION TO DISMISS WITH PREJUDICE DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT (ECF 109) AND INDIRECT PURCHASERS' CONSOLIDATED CLASS ACTION COMPLAINT (ECF 110) with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Kathryn A. Reilly*